**RAILROAD COMMISSION OF TEXAS et al., Appellants,**

v.

**ENTEX, INC., Appellee.**

**No. B–8584.**

Supreme Court of Texas.

April 2, 1980.

Rehearing Denied May 21, 1980.

Mark White, Atty. Gen., J. Scott Wilson, Asst. Atty. Gen., Austin, Don R. Butler, Austin, for appellants.

Fulbright & Jaworski, Jefferson D. Giller, Louis S. Zimmerman, Houston, for appellee.

DENTON, Justice.

This is a direct appeal by the Railroad Commission from a district court judgment invalidating the rate order entered by the Commission for Entex, a gas utility. We hold that the Railroad Commission's order met all legal requirements and was supported by substantial evidence in the record. The district court judgment is reversed and the order of the Railroad Commission is reinstated.

In March 1976, Entex applied for a rate increase from the City of Beaumont, Texas (hereinafter referred to as City). The City failed to act, and Entex appealed to the Railroad Commission for a rate increase equal to an 8% return on the rate base. After an evidentiary hearing before an examiner, the Railroad Commission entered an order on September 12, 1977, which granted Entex a 4% rate of return on its adjusted value of invested capital rate base of $14,005,509. Entex filed a motion for rehearing. On October 24, 1977, the Railroad Commission entered an order which adopted the Examiner's Report and Proposal for Decision and denied Entex's objections to the order. Entex appealed to the District Court of Travis County which declared the order setting a 4% rate of return invalid, and permanently enjoined its enforcement, and remanded the order to the Railroad Commission (hereinafter referred to as the Commission).

The finding of the Commission that Entex had operating expenses of $11,944,535 is unchallenged. The Commission followed Section 41 of the Public Utilities Regula-

tory Act, Tex.Rev.Civ.Stat.Ann. art. 1446c (hereinafter referred to as PURA) and determined Entex's rate base from the value of property "used by and useful" to the utility in providing service. The adjusted value of the property was determined to be 14,005,509 by weighting 60% as original cost less depreciation and 40% as current cost less an adjustment for present age and condition. The controversy is whether the Commission made a proper determination of the rate of return under Sections 39 and 40 of the PURA, and whether a 4% rate of return on the adjusted value of invested capital is reasonable.

■ A proper rate determination requires a consideration of three important factors: (1) the utility's reasonable operating expenses; (2) the rate base; and (3) a reasonable rate of return. *Railroad Comm'n v. Houston Natural Gas Co.*, 155 Tex. 502, 289 S.W.2d 559, 573 (1956) (hereinafter referred to as the *Alvin* case). First, there must be a determination by the regulatory authority of the utility's reasonable operating expenses. After deciding what utility property will be included in the rate base, the next step is the rate base calculation. The two major approaches currently used in rate base calculations are "original cost depreciated" and "fair value," which represents the cost of reproducing the utility's facilities. After the rate base is determined, the regulatory authority determines the rate of return, or the percent of the rate base which will be recoverable in revenues by the utility.

The rate base and rate of return are interdependent, and by manipulation of either, the regulatory authority may correct an inequitable rate which results from inflation or recession. In an inflationary period, a fair value approach would use a lower rate of return to counteract the inflated rate base. An original cost depreciated approach, on the other hand, would use a higher rate of return to insure a reasonable recovery for the utility. All of these factors must be taken into consideration for a reasonable rate to be determined. *See,* Butler, The Rate of Return in Texas—The

Neglected Issue, 28 Baylor L.Rev. 937 (1976); Student Symposium, Public Utility Regulation in Texas, 7 St. Mary's L.J. 515 (1975).

Texas is a fair value jurisdiction. A fair value rate base was first determined as a ratio between original and replacement costs in the *Alvin* case, but later this concept was utilized in the PURA. Section 41 of the PURA requires that the rate base be determined as a balance between original cost depreciated and current reproduction cost less an adjustment for age and condition. Under section 41, the "adjusted value" of property "used by and useful to the public utility" is based upon 60 to 75 percent of the original cost less depreciation and 25 to 40 percent current reproduction cost less an adjustment for age and condition. The exact balance is within the discretion of the Commission. This type of ratio has the advantage of stabilizing utility rates in periods of inflation or recession.

■ Within statutory guidelines the Commission has the discretion to determine the rate of return to be applied to the rate base. Section 39 of the PURA provides that the overall revenues which result from the application of the rate of return to the adjusted value rate base must be sufficient for the utility to recover its operating expense plus a "reasonable return on its invested capital." In *Southwestern Bell Tel. v. Public Utility Comm'n*, 571 S.W.2d 503, 515 (Tex.1978) we held that "invested capital" in section 39 of the PURA meant original cost less depreciation.

In addition, in Section 40(a) of the PURA, the Commission is prohibited from setting a rate that would result in "more than a fair return upon the adjusted value of the invested capital used and useful in rendering service to the public." Therefore, section 39 provides the "floor" on the rate of return, i. e. requiring minimum revenues to equal operating expenses plus a reasonable return on original cost less depreciation. Section 40(a) is the "ceiling" in that the rate of return cannot yield revenues greater than a fair return on adjusted value. The rate of return may be set by the Commis-

sion at any level within those two extremes. It should be pointed out that the "floor" and "ceiling" analogy is appropriate in an inflationary period, but that in a recession, section 39 might be the "ceiling" and section 40(a) the "floor."

There may be other considerations in setting the rate of return. In times of shortage, the Commission may consider the need to provide an incentive for exploration or increased reserves. The reasonable rate must balance the consumer's desire for low rates against the utility's need to improve and expand.

Another factor in determining a reasonable rate of return is the utility's financial structure. Debt financing or borrowed capital is generally cheaper than equity financing or capital obtained from the sale of stock, and utilities commonly use both sources of capital. The cost of debt and equity, and the ratio of the two types of financing yields the cost of capital. This cost of capital and the ratio of debt and equity must be established by expert testimony.

The Public Utility Commission has adopted substantive rules which weight the type of debt based on a utility's actual capital structure. Each debt percentage is then multiplied times the debt cost in terms of percent return required on the debt. Added together these elements yield a composite rate of return which is then multiplied times the adjusted value rate base to equal the amount of return. For example:

| Type of Capital | Percent of Total Capital | Cost Rate | Weighted Cost |
|---|---|---|---|
| Debt | 66% | X 6% | 4% |
| Common stock equity | 34% | X 12% | 4% |
| Composite rate of return | | | 8% |

Although the Commission has not adopted a similar substantive rule, based on the Commission's findings, their preliminary approach to rate setting appears to be the same. However, after considering the 8% composite rate of return requested by En-

tex, the Commission also considered the effect of that rate on the return to book common equity.[1]

The importance of considering the return to book common equity in a fair value jurisdiction can be easily demonstrated. Debt and preferred stock costs are not affected by inflation because the utility's obligation to the investor remains the same. Even with an increase in the adjusted value rate base, the holder of debt or preferred stock will not realize a greater return on the initial investment. Because the cost of this type of capital remains fixed, additional return to the utility due to an adjusted value rate base will go to the equity holder or common stock investor. An exorbitant return to the common stock equity could be considered by the Commission in determining a reasonable rate of return, however, the basic legal requirements for a rate of return must be satisfied.

The basic legal requirements of a rate of return were set out by the United States Supreme Court in *Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of West Virginia*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923):

A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of

1. The return to book common equity is a form of historical cost risk analysis and is one of the methods of evaluating proposed utility rates.

It is a measure of the return to the common shareholders on their investment, and is often evaluated by regulatory authorities.

return may be reasonable at one time, and become too high or too low by changes affecting opportunities for investment, the money market, and business conditions generally.

*Id.* at 692–93, 43 S.Ct. at 679.

In *FPC v. Hope Natural Gas Co*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), the United States Supreme Court further elaborated the requirements for a rate of return. By the time of the *Hope* opinion it was recognized that utility companies attract capital on a national market and greater emphasis was placed on the utility's earnings in comparison to similarly situated utility companies. The *Hope* court stated:

> [I]t is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. . . . By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.

*Id.* at 603, 64 S.Ct. at 288.

In *Railroad Comm'n v. Houston Natural Gas Corp.*, 155 Tex. 502, 289 S.W.2d 559 (1956) known as the *Alvin* case, Texas law was applied to utility rate making. In *Alvin* it was recognized that there are two means of raising capital, either by borrowing or by the sale of stock. It was also recognized that as a general rule, borrowing is the cheaper of the two methods, and that most utilities follow a well defined ratio between capital raised by investment in stock and that which is borrowed. Although the statute in effect in *Alvin* prohibited rates fixed upon stocks and bonds issued by the utility, it was stated that there was nothing to prohibit "general consideration of the two methods of raising capital and of arriving at a rate of return which is a composite of the two on the current market." *Id.* at 573.

The major holding of the *Alvin* case was that Texas law mandated a fair value rate base rather than an original cost rate base. The rate of return issue was also considered, and it was held that the rate of return must be sufficient to avoid confiscation and must be "high enough to attract ample capital but need not go beyond that. . . . ." *Id.* at 572. Indeed, the rate of return issue was framed as "what is the lowest composite percentage rate of return which will induce the investment of adequate capital?" *Id.* at 575.

Therefore, *Alvin* would allow a general consideration of the return necessary to common stock equity, in order to insure that the utility's rate of return would be sufficient to attract capital. The PURA was enacted subsequent to the *Alvin* case. Still, under the PURA, a consideration of the return to common stock equity would also be in keeping with the requirement of section 39 that a reasonable return to invested capital be recovered.

In *Southwestern Bell Tel. v. Public Utility Comm'n*, 571 S.W.2d 503 (Tex.1978) (hereinafter referred to as Southwestern Bell), we considered the statutory requirements of the rate base and the rate of return under the PURA. In holding that in a rate base determination the regulatory authority must purport to follow section 41(a) of the PURA, and that a dual rate base calculation was an incorrect interpretation of that statute we stated:

> It seems obvious that the Commission figured the total revenues or monetary return to which Bell was entitled by one method or the other, and merely used that same figure to determine a rate of return on the other rate base. As stated above, we do not accept a dual rate base theory, but the Commission purported to determine the monetary return based upon what we have held to be the correct rate base, the adjusted value of invested capital. By using this method of fixing revenues for Bell in the alternative, the Commission has acted correctly.

*Id.* at 515.

The rate of return was also at issue in *Southwestern Bell*. In discussing the

breadth of the regulatory authority's discretion in this area, this Court stated:

> The rate of return is not specified in the PURA as any exact percentage. Rather, sections 39 and 40(a) provide that it shall be at least a reasonable return on invested capital, but not more than a fair return on the adjusted value of invested capital. We take these provisions to mean that the Commission has discretion in setting a reasonable or fair return on the value of Bell's property used or useful in rendering service. In giving the Commission such discretion, we believe that the Legislature has acquiesced in the standard for rate of return set out in the *Alvin* case. . . . We are not to be understood as holding that the Legislature has codified the *Alvin* case, because the Commission rather than the trial court must set the rate of return. The PURA also establishes more specific standards in fixing a rate base than the general "fair value" language of *Alvin*. We do, however, regard the Commission as having the power to determine a percentage rate of return as a fact. . . . The total revenues or monetary return to Bell lies within the limits prescribed by sections 39 and 40, and we regard the revenues as a fair return on the adjusted value of Bell's invested capital. We therefore uphold the Commission's determination as to the rate of return and revenues or monetary return to which Bell is entitled. Although we reject the notion of a dual rate base, we hold that the Commission's alternative method of setting the rate of return and rate base was correct under the PURA.

*Id.* at 515–16.

■ Using this pragmatic approach, when the Commission follows section 41(a) in determining the rate base, and the rate of return is within the range prescribed by sections 39 and 40(a), then the statutory and basic legal requirements have been satisfied. Next we must consider how the Examiner reached the results in this case.

■ Entex does not question the Commission's finding of a $14,005,509 adjusted value of invested capital rate base or the manner in which that determination was made. However, Entex does argue that it was error for the Commission to calculate the rate of return based on what would be a reasonable return to book common equity of Entex stock. Entex contends that such a determination is equivalent to making a rate base determination based solely on original cost depreciated rather than on fair value as required by *Alvin* and the PURA. They argue that by basing the rate of return on the return to book common equity, that the Commission has determined the reasonable revenues allowed on an original cost less depreciation base and "backed into" the fair return on adjusted value rate base required by PURA by means of a much lower rate of return. They argue that this "backing in" means of calculation is prohibited by *Southwestern Bell*. It is urged that the Court should follow the example of the courts in North Carolina, Ohio, Montana and Arizona and hold that the "standard for establishing a rate base must be the fair value of the property and not what the commission might believe was a fair rate of return on common equity." *Simms v. Round Valley Light & Power Co.*, 80 Ariz. 145, 294 P.2d 378 (1956); *see, Arizona Corp. Comm'n v. Arizona Public Service Co.*, 113 Ariz. 368, 555 P.2d 326 (1976) (en banc); *Cleveland Electric Illuminating Co. v. Public Utilities Comm'n of Ohio*, 42 Ohio St.2d 403, 330 N.E.2d 1 (1975); *Montana v. Public Service Comm'n*, 131 Mont. 272, 309 P.2d 1035, 1039 (1957); *State Utilities Comm'n v. Duke Power Co.*, 285 N.C. 377, 206 S.E.2d 269 (1974). Entex concedes that North Carolina, Ohio, and Montana have enacted new statutes departing from the statutory requirements of rate making that was used in the prior cases. It should be noted that none of these cases involved a statutory scheme such as Section 39 of PURA which required a consideration of fair return to invested capital.

In *State Utilities Comm'n v. Duke Power Co.*, 285 N.C. 377, 206 S.E.2d 269 (1974) the North Carolina Supreme Court stated that "It is not for the Commission or for this

Court, to evade the mandate of the statute by determining the number of dollars which would be a fair return on the original cost, depreciated, and then simply translating that amount into a percentage of 'fair value'." In that case the court concluded that the commission had determined the revenue recovery permitted the utility by: (1) calculating an original cost depreciated rate base; (2) multiplying the original cost rate base by the rate of return necessary to yield the permissible revenue; (3) increasing the rate base to the "fair value" required by statute but lowering the rate of return in the same proportion as the increase in the rate base. *Id.* at 279.

However, the *Duke* case is easily distinguishable from the case before us. In *Duke*, the issue was whether the rate had actually been based on a fair value rate base, and there was no statutory requirement that invested capital be considered in determining a reasonable rate of return. Here, there is no contention that the Commission did not correctly determine the adjusted fair value rate base, and the PURA requires a consideration of the return to invested Capital in section 39. Therefore, we conclude that the Commission's consideration of the return to book common equity in setting the rate of return, did not violate the statutory requirement that the rate be based on the adjusted fair value of the utility property used in providing the service.

■ Entex also argues that the district court was correct in its holding that a 4% rate of return was unreasonable. Texas law no longer provides for a trial de novo review of rate cases or for an "end-result" test as in the *Alvin* case. After the passage of the Texas Administrative Procedure Act, Tex.Rev.Civ.Stat.Ann. art. 6252–13a (hereinafter referred to as the APA), the standard for judicial review of the Commission's orders is the substantial evidence rule. The court may reverse or remand the Commission's decision if it is not reasonably supported by substantial evidence on the agency record, or if it is apparent that the agency action was arbitrary or an abuse of discretion. *Southwestern Bell Tel. v. Public Utility Comm'n*, 571 S.W.2d 503, 512 (Tex. 1978).

■ Section 16(b) of the APA requires that agency decisions include separately stated findings of fact and conclusions of law. "The findings should be such that a court, on reading them, could fairly and reasonably say that they support the ultimate findings of fact required for its decision." *Railroad Comm'n v. Graford Oil Corp.*, 557 S.W.2d 946, 950 (Tex.1977). If the agency findings do not support its decision, then the order would be invalid for noncompliance with the APA. Therefore, this Court's duty in reviewing the Commission's order setting the rate of return is to insure that the decision was based on substantial evidence. In determining whether there is substantial evidence, we do not substitute our own judgment, but consider only the record upon which the decision was based. *Imperial American Resources Fund Inc. v. Railroad Comm'n*, 557 S.W.2d 280, 284–85 (Tex.1977). Entex has the burden of proof to show an absence of substantial evidence in the record which would support the Commission's decision and they have the additional burden of showing that a 4% rate of return is unreasonable and unjust. *Id.* at 286; Section 40(b) PURA.

■ It is significant to note that the Examiner's report adopted by the Commission states that the rate of return must be based on the utility rate base rather than the return to book common equity. However, noting the requirement of section 39 of the PURA, that there be a reasonable return to invested capital, the Commission considered the return to book common equity that would be realized by the requested rate of 8%. It was noted that in a fair value jurisdiction the rate of return multiplied by the rate base usually resulted in a higher return to the book common equity than in an original cost jurisdiction because of the inclusion of the reproduction cost new factor.

At page 14 of the report, the Commission concluded:

It is certainly true that book common equity figures are somewhat deceptive and unreliable but the fact cannot be denied that the return to book common equity is used as a performance indicator by the investor and cannot be ignored by blindly applying a rate of return to the fair value rate base without noting the consequences of such rate of return on the elements of the capital structure. *The return to book equity even in a fair value jurisdiction should not be grossly out of line with such a return in an original cost jurisdiction.*

(Emphasis added).

The expert witness for Entex testified that: (1) the utility needed a 16% return to the equity portion of the capital structure based on a return to the market value of the stock, rather than a consideration of the return to book common equity; (2) comparable gas distribution companies received a 14 to 16% return on book common equity; (3) he had not considered section 39 or the effect on the return to book common equity in reaching his conclusion; (4) in his opinion the company's overall cost of capital exceeded 12%; and (5) Entex had asked for an 8% rate of return rather than 12% in order to follow the Commission's past practice. The City's experts testified that a return to book common equity of 13.5% to 14.5% would allow Entex to attract ample capital, but recommended that a return of 17.5% be allowed because of the unreliability of book figures. The City's expert also testified that Entex had previously earned an average return of 21.31% on book common equity compared to other gas utilities in the same period which had earned a return to book common equity of only 12.81%.

The Commission considered the effect of an 8% rate of return on the adjusted value rate base of $14,004,187. When the income expense of $243,258 was deducted from the amount of required operating income, $1,120,335, there remained $877,077 to be applied to book common equity, for a return of 48.17% to book common equity. At page 15 of the adopted report it was concluded:

*There is certainly no testimony in the record to support such a high return to book common equity.* This is a prime example of the situation where the return on invested capital must be considered as a check on the return to the fair value rate base. The rate of return to the rate base is certainly the primary inquiry to determine the utility's income requirements. In the same vein, the fairness of the rate base or the rate of return can be measured by the cash requirements of the utility. All are interdependent and ultimately need to be reconciled. *. . . a return to book common equity which is out of proportion, as is true with Entex here, cannot be ignored since it is more than necessary to attract capital, and therefore, unfair to the ratepayer.*

(Emphasis added).

The Commission then studied the effect of a 4% rate of return on the return to book common equity, and found that the return would be 17.6%. There is nothing in the report to indicate that the 4% rate of return was the result of a "backing in" type of calculation based on an original cost depreciated rate base. This return to book common equity was higher than the range that had been recommended by the City's expert witness, but it was allowed by the Commission in order to compensate for various accounting factors.

On the record it would appear that there was substantial evidence to justify the setting of a 4% rate of return, and conversely that there was not substantial evidence to justify the 8% rate requested by Entex. It would also appear that the 4% rate of return was not arbitrary and not an abuse of the Commission's discretion under the PURA. Therefore, since the statutory requirements and basic legal requirements have been satisfied, and there was substantial evidence in the record to support the Commission's order, we hold that a 4% rate of return on the adjusted value rate base is not unjust and unreasonable, and we order that the judgment of the district court be reversed, and the Railroad Commission's order be reinstated.

POPE, J., dissenting in which GREEN-HILL, C. J., and McGEE, J., join.

GARWOOD, J., not sitting.

POPE, Justice, dissenting.

I dissent.

The Railroad Commission and the majority have reverted to the discredited rule which applies the rate of return to the original cost depreciated. That rate base is contrary to the fair value method that was approved in *Railroad Commission v. Houston Natural Gas Corp.*, 155 Tex. 502, 289 S.W.2d 559 (1956), prior to the adoption of the Public Utilities Regulatory Act, and it violates the statutory scheme for a fair return that is spelled out in sections 39, 40, and 41 of article 1446c. This court has previously approved and the legislature has required a method by which a return is allowed upon a ratio of both original cost and current cost which are included in the rate base. *Southwestern Bell Tel. v. Public Utility Commission*, 571 S.W.2d 503 (Tex. 1978); *Railroad Commission v. Houston Natural Gas Corp., supra*; Tex.Rev.Civ. Stat.Ann. art. 1446c §§ 39, 40, 41 (1979) [hereafter "PURA"].

The hearing examiner in this case made a determination of the rate of return upon original cost depreciated which it considered sufficient to attract capital and then used that figure as the controlling consideration. He then translated that return into a percentage figure of the statutory adjusted value so that the return would exactly equal the dollar return upon original cost depreciated that was already settled upon. It is that return on the original cost depreciated which was the basis—the only basis—for the Commission's ruling, as we shall see.

The Commission made these determinations in applying its 60/40 ratio to arrive at the adjusted value rate base.

Rate Base on 60/40 Ratio

| | | |
|---|---|---|
| Original Cost | $ 9,675,761 | |
| Less Accumulated Depreciation | (4,420,339) | |
| Net Original Cost | 5,255,422 | |
| Ratio per Sec. 41 | × 60% | |
| The 60% Element | | $ 3,153,253 |

| | | |
|---|---|---|
| Current Cost | $30,135,506 | |
| Adjustment for Age | (3,267,309) | |
| | $26,868,197 | |
| Ratio per Sec. 41 | × 40% | |
| The 40% Element | | 10,747,279 |

| | | |
|---|---|---|
| Construction in Progress | 12,284 | |
| Working Capital | + 91,366 | |
| | | 103,650 |
| ADJUSTED VALUE IN INVESTED CAPITAL | | $14,004,182 |

The adjusted value of invested capital, which in this case is $14,004,182, is of controlling statutory significance but the Commission disregarded it. Section 41, article 1446c, states that "Utilities rates shall be based upon the adjusted value of property used and useful to the public utility in providing service . . . ." In applying a rate upon that legislative rate base, we have previously held that there is a legislative floor and a legislative ceiling to the rate base which must be honored. Section 39 of article 1446c, which permits a utility to recover its operating expenses together with a reasonable return on its invested capital, has now been settled and declared to be the minimum rate base. As explained in *Southwestern Bell Telephone Company v. Public Utility Commission of Texas, supra*, section 39 which sets the minimum rate base is determined by a consideration of the reasonable return on the original cost less depreciation. We ruled further in *Southwestern Bell, supra*, that 40(a) of article 1446c, prescribes a ceiling for the rate base of a utility, *Southwestern Bell, supra* at 514. That ceiling permits a return that will not be *more* than a fair return on the adjusted value. A point that the Commission does not recognize is that section 41 requires a rate based on adjusted value which is a *fair* return but under section 40(a), not *more* than a fair return. The fair return under the statute must be computed on the adjusted value, not the original cost depreciated.

As a matter of statutory construction, therefore, and as this court has already ruled, the dollar return to the utility must be a fair return on the adjusted value, and

in no event shall it be less than a fair return on the original cost depreciated nor more than a fair return on the adjusted value. But it shall be a fair return on the adjusted value. PURA § 40(a).

In *Southwestern Bell, supra* at 516, we rejected the idea that Texas had a dual rate base, that of original cost depreciated and that of adjusted value. In that case, we approved a rate of return of 8.37% on the adjusted value of invested capital. We approved that rate of return after satisfying ourselves that the dollar return was between the minimum or floor that would be returned on the original cost depreciated [sec. 39] and yet was a fair return—and not more than a fair return—on the adjusted value [sec. 40(a)]. Our decision in *Southwestern Bell* correctly decided that the rate of return should be not more than a fair return on the adjusted value of a utility's property but not less than a reasonable return on the depreciated original cost of that property. We need to apply that same rule in this case.

The records before us show that the Commission in this case has applied the wrong rule and violated sections 39, 40, and 41 of PURA. The Commission has adopted the exact computations recommended by the hearing examiner, and those figures are solely grounded upon the wrong rate base. They are computed as a rate of return on the original cost depreciated rather than on the statutory adjusted rate base. The return on the original cost depreciated is treated as the ceiling for the utility's return, rather than the floor. The Commission ignored the adjusted value rate base until it made its decision grounded on original cost. It then converted the percent of return on original cost to the percentage rate of return on the adjusted value so that the two would be exactly the same.

We need to trace the steps of the examiner in arriving at his recommendation. The examiner made a correct statutory determination that the adjusted value was $14,004,-182. He then quit the statutory quest for a return on that value. His report states that his next step was to turn to the original cost depreciated. The examiner's report states, "Before the specific rate of return may be calculated by *any* method, it is helpful in the process to arrive at a capital structure for Entex." [Emphasis added.] The findings made by the examiner show this as his idea of the Entex capital structure:

Entex Capital Structure
(100% Original Cost Depreciated)

| | Cost | | Required Return |
|---|---|---|---|
| Debt (Notes & Bonds) | $3,558,549 | 6.84% (rounded) | $243,258 |
| Book Common Equity | 1,800,523 | 17.6% (rounded) | 316,909 |
| TOTAL CAPITAL | $5,359,072 | | $560,167 |

At once, it is apparent that the item, "Total Capital," is the identical figure for original cost depreciated in the previous table.[1] It is that item upon which the rate in this case has been fixed, and not the statutory *base* which was $14,004,182. His next step was to determine the amount of the book common equity. That figure, as appears in the table above, is an accounting figure which is reached by a subtraction of Entex's debts (notes, bonds and preferred stock) from the original cost depreciated. That is what the examiner's figures show. He arrived at the value of book common equity by using 100% of the original cost depreciated.

The examiner's report to the Commission stated that book common equity was $1,800,523 and that the interest on Entex's debts was 6.84% (rounded) which called for a required return of $243,258. The report showed that the examiner recommended a 17.6% (rounded) return on the $1,800,523 which would produce a return of $316,909.

[1]

| | | |
|---|---|---|
| Net Original Cost | | $5,255,422 |
| Plus: Construction Work in Progress | $12,284 | |
| Working Capital | 91,366 | |
| | | 103,650 |
| TOTAL CAPITAL | | $5,359,072 |

The required return would be the total of those two figures or $560,167. The importance of quoting these precise figures is that the Commission, by its adoption of the examiner's exact figures, to the penny, has adopted the examiner's report and recommendation, including his non-statutory method which looked alone at the original cost depreciated rate base and at 100% of that base.

The Commission adopted the examiner's exact recommended return by ordering that Entex could recover a dollar return of $560,000. It then obscured its method for fixing the return on the non-statutory original cost depreciated rate base. Again, we go to the forthright statement of the examiner which shows how the original cost method was transmuted into a statutory facade by couching it in the language of section 41. With emphasis again upon the exact figures deduced exclusively from the original cost depreciated method, the examiner found:

A 4% return on the rate base (adjusted value rate base) produces a required return of $560,167 and when the interest expense of $243,258 is deducted therefrom, the amount left to be applied to the book common equity (computed at 100% original cost depreciated) results in a return of 17.6%. [Parenthesis added.]

This wrongful use of the original cost depreciated as the rate base is further evidenced by this part of the examiner's report:

The difference of opinion regarding rate of return represents the elemental and fundamental gap between the parties in this proceeding—*that of determining a rate of return on the utility's rate base* or *beginning such an inquiry based on return to book common equity.* [Emphasis added.]

Entex, in other words, took the position that the Public Utility Regulatory Act called for a rate based upon the utility's adjusted rate base. That position was surely a reasonable one since the applicable statute so states. The City took the position that the root question was a determi-

nation of the return to book common equity. If that be the rule, the statute does not say so. Book common equity is reached, not by determining the adjusted value base; it is reached by determining 100% of the original cost depreciated.

The Commission adopted the examiner's finding to the dollar and concluded:

3. A 4% rate of return amounting to $560,167 on the fair value base of $14,004,182 is a fair and reasonable rate necessary for the Entex Beaumont distribution system to contribute to the maintenance of the financial integrity of Entex, Inc. and to allow for the attraction of new capital.

It would have been equally wrong if the Commission had made a similar exclusive use of the other component of the statutory rate base—100% of the current cost with adjustments [sec. 41(a)]. If the examiner had used only that component of the rate formula, the common equity would have been greatly enhanced above the book common equity figure of $1,800,523. These are the figures for the current cost with adjustment.

Entex Capital Structure
(100% Current Cost Adjusted)

| | | | |
|---|---|---|---|
| Debt (Notes & Bonds) | $ 3,558,549 | 6.84 | $243,258 |
| Common Equity | 23,309,648 | ---- | 316,909 |
| TOTAL CAPITAL | $26,868,197 | | $560,167 |

If the Commission had used both components under the statutory scheme, that of original cost less depreciation and current cost less adjustment, and if it had used the statutory 60/40 ratio of the two, we would have had this fair value common equity:

Entex Capital Structure
(60/40 Ratio of Original Cost & Fair Value)

| | |
|---|---|
| Debt | $ 3,558,549 |
| Fair Value Common Equity | 10,445,638 |
| TOTAL CAPITAL ADJUSTED RATE BASE | $14,004,187 |

Sections 39–41 state that the return shall be not more than a fair return upon the fair value common equity. The return should be computed upon fair value common equity which comes from the infusion of 40% of

the current cost less adjustments. When the examiner and the Commission proceed in rate hearings to fix rates upon book common equity, they render sections 40 and 41 superfluous. If the Commission may fix a return based upon book common equity which is 100% of the original cost depreciated and if it determines, as it did in this case, that the return on book common equity is the maximum or ceiling for dollar return, it disregards the statutory scheme. That method is the same as it would have been without the enactment of sections 40 and 41 and the adoption of the rule which authorizes a fair return on fair value.

Once the wrong rule is used, it is easy to clothe the order in statutory language. All that need be done is to select the return on original cost depreciated and then translate the rate into any adjusted value that one might choose. For example, if the Commission decided that a fair return would be $560,000, expressing that return as a percentage of the lawful adjusted value would be a matter of simple arithmetic, as this schedule demonstrates:

| Rate Base | $14,000,000 | $9,333,333 | $7,000,000 | $5,600,000 |
| Rate of Return | 4% | 6% | 8% | 10% |
| TOTAL REVENUE | $ 560,000 | $ 560,000 | $ 560,000 | $ 560,000 |

Recall that the 4% yield on the adjusted value rate base ($14,004,182) would pay the fixed cost of the debt ($243,258) plus a 17.6% return of $316,909 on book common equity. However, a $316,909 return on fair value common equity ($10,445,638) would amount to a percentage return of only 3.03%.

The legislative scheme contemplated the return on the fair value—not original cost. This precise problem of legislative adoption of a fair value rate was discussed in *State ex rel. Utilities Commission v. Duke Power Co.*, 285 N.C. 377, 206 S.E.2d 269, 279 (1974):

> Here, too, the Commission and this Court are bound by the provisions of G.S. § 62-133(b). The concept therein contained of a fair rate of return on the fair value of the properties used in rendering the service *clearly contemplates the allowance of a greater dollar return than would be allowed if the rate base were the original cost, depreciated, of the same properties*, assuming, as is here true, that the value of the properties has been enhanced by inflation. *Otherwise, the exceedingly costly and laborious determination of "fair value," as distinguished from original cost, depreciated, would be a meaningless exercise.* It is not for the Commission, or for this Court, to evade the mandate of the statute by determining the number of dollars which would be a fair return on the original cost, depreciated, and then simply translating that amount into a percentage of "fair value." [Emphasis added.]

The reasoning of *Duke* is persuasive. Our legislature did not require a determination of the section 41(a) rate base for naught. The legislature meant, by requiring the rate base to include an element of replacement cost, that Texas utilities should recover more revenue than they would have recovered if the rate base were valued 100% at original cost depreciated. Section 41(a) means something. If a regulator need only give a utility the section 39 floor revenues, then why determine an adjusted value rate base? Why not just multiply the original cost rate base by the composite percentage cost of capital established by expert testimony? We could simply forget section 41(a) and save ourselves the trouble of determining an adjusted value rate base. Of course, *Southwestern Bell Tel. v. Public Utility Commission*, 571 S.W.2d 503 (Tex. 1978), requires a regulator to use the section 41(a) rate base in arriving at permissible revenue.

Again, a return sufficient to attract ample capital, if that is all there is to the rule, may always be translated into a percent of an adjusted value rate base. Such an approach to utility regulation, however, does not grant a utility "any return on the difference in value between the adjusted value of invested capital and original cost." *Bell*, at 514. It seems that by requiring a regulator to determine an adjusted value rate base, the legislature intended utilities to earn some return on this difference. The correct statutory rule is that the return must be a fair return on the adjusted value,

which is the only rate base under sections 39–41, PURA. Expert opinion about rate of return should have been addressed to that base, rather than to the unlawful original cost depreciated or to book common equity. It is the adjusted value rate base upon which the rate of return applies, for "By that standard the return to the equity owner should be commensurate with the returns on investments in other enterprises having corresponding risks." *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

Texas follows the fair value concept in rate making. *General Telephone Co. of the Southwest v. City of Wellington*, 156 Tex. 238, 294 S.W.2d 385 (1956); *City of Arlington v. TESCO*, 540 S.W.2d 580 (Tex.Civ. App.—Fort Worth 1976, writ ref'd n. r. e.); *City of Athens v. Gulf States Telephone Co.*, 380 S.W.2d 687 (Tex.Civ.App.—Tyler 1964, writ ref'd n. r. e.); *City of Weslaco v. General Telephone Co. of the Southwest*, 359 S.W.2d 260 (Tex.Civ.App.—San Antonio 1961, writ ref'd n. r. e.); *San Antonio Transit Co. v. City of San Antonio*, 323 S.W.2d 272 (Tex.Civ.App.—San Antonio 1959, writ ref'd n. r. e.). In *Bayou Pipeline Corp. v. Railroad Commission*, 568 S.W.2d 122 (Tex. 1978), we upheld the Commission's order setting an 8% return on fair value of a gas transmission line, and in doing so we held that "the Commission arrived at this rate by determining a fair return on the fair value rate base of Bayou's transmission properties. This was in line with the standard which is codified in PURA, art. 1446c . . . ." That is a correct rule of law. In *Southwestern Bell Tel. v. Public Utility Commission*, 571 S.W.2d 503 (Tex.1978), we approved an 8.37% return on the statutory rate base of adjusted value of invested capital.

Entex has not received any rate increase. As a result of these proceedings, it has received a rate decrease as appears both from the examiner's report and the letter of transmittal by the examiner. As stated by the examiner:

As I stated to you previously, I want to make you aware that the rate of return

which I have recommended to the fair value rate base for Entex is 4% which results in a rate of return on the book common equity of 17.6%. This case is the first departure from an 8% return to the fair value rate base in some time but it is my feeling that the Commission is now interested in looking at the return to book equity when it is excessive and the application of an 8% return to Entex' fair value rate base would result in a 48% return to the book equity which I would consider to be excessive. The 17.6% return to the book equity which results from a 4% return on the rate base is somewhat under the 21% average return to book common equity of Entex, Inc. during that last five years.

The recommendation, as we have seen, was followed and for the first time in some time, the Commission departed from its award of 8% on adjusted value. It granted only a 4% return. In doing that, it reduced Entex's return from a 21% return on book common equity that Entex was already receiving to 17.6%.

So long as the statutes require a fair return on fair value rather than original cost, the examiner's report has no legal basis. As was stated in *State ex rel. Utilities Commission v. Duke Power Co.*, 285 N.C. 377, 206 S.E.2d 269, 279 (1974):

It is not for the Commission, or for this Court, to evade the mandate of the statute by determining the number of dollars which would be a fair return on the original cost, depreciated, and then simply translating that amount into a percentage of "fair value."

The Texas statute authorizes a return on fair value which almost always exceeds a fair return on original cost. *See Duke Power Co., supra.*

State utility regulation is new to this jurisdiction, but the question presented by this appeal has been resolved in other jurisdictions with more experience. The problem is not solved by the examiner's and Commission's asking the wrong question. It is wrong to ask what return will attract capital upon a rate base of original cost

depreciated. The legislature has posed for the Commission a different but clear statutory question: What rate of return will attract capital upon the adjusted value rate base—not the original cost; and upon the fair value common equity—not the book common equity? *State ex rel. Utilities Commission v. General Telephone Co. of the Southeast,* 281 N.C. 318, 189 S.E.2d 705 (1972); *Ohio Edison Co. v. Public Utilities Commission,* 173 Ohio St. 478, 184 N.E.2d 70 (1962).

The Commission's order was clearly grounded upon a return upon the wrong rate base, as was conclusively shown by its approval of the examiner's disregard for the fair value rate base.

The Commission substituted its own non-statutory standard for the fair value rate base. It denied Entex any return upon its fair value rate base.

I would affirm the judgment of the district court.

GREENHILL, C. J., and McGEE, J., join in this dissent.

GARWOOD, J., not sitting.