**RAILROAD COMMISSION OF TEXAS, Appellant,**

v.

**LONE STAR GAS COMPANY, A Division of Enserch Corporation, Appellee.**

No. 13135.

Court of Civil Appeals of Texas, Austin.

April 23, 1980.

Rehearing Denied June 11, 1980.

Mark White, Atty. Gen., J. Scott Wilson, Asst. Atty. Gen., Austin, for appellant.

Barry Bishop, Clark, Thomas, Winters & Shapiro, Austin, for appellee.

SHANNON, Justice.

Appellee Lone Star Gas Company filed an administrative appeal from the order of the Railroad Commission of Texas in Gas Utilities Docket No. 1020 in the district court of Travis County. The Commission's order set rates for natural gas service to residential and commercial customers within the cities of Celeste, Gainesville, Lake Dallas, McGregor, Quitman, and Seymour. After hearing, the district court entered judgment setting aside the agency order, insofar as it pertained to the rate of return for the cities of Celeste, McGregor, Quitman, and Seymour. The judgment further ordered the Commission to determine the rate of return predicated upon the adjusted value of invested capital as defined in Tex.Rev.Civ. Stat.Ann. art. 1446c, Sec. 41(a), the Public Utility Regulatory Act.

A utility's return on its investment is the product of the rate base multiplied by a fair rate of return. *Southwestern Bell Telephone Company v. Public Utility Commission*, 571 S.W.2d 503 (Tex.1978). "Rate base" is defined as that sum that represents the total *quantum* of invested capital or of property "values" on which the utility is entitled to a reasonable rate of compensation. Nichols and Fields, *Rate Base Under PURA; How Firm Is the Foundation*, 28 Baylor L.Rev. 861, 862 (1976).

In Texas, the legislature, by Tex. Rev.Civ.Stat.Ann. art. 1446c, Sec. 41(a), has determined the components of the "rate base" for purposes of utility rate-making. *Southwestern Bell Telephone Company v. Public Utility Commission, supra.* Section 41(a) provides that "[u]tility rates *shall* be based upon the adjusted value of property used by and useful to the public utility in providing service . . . ." (Emphasis supplied). That section provides that the adjusted value of such property shall consist of a reasonable balance between (1) original cost less depreciation and (2) current cost (reproduction cost) less an adjustment for both age and condition. The regulatory agency is given the discretion to determine a reasonable balance that reflects not less than 60% nor more than 75% original cost-less depreciation, and not less than 25% nor more than 40% current cost (reproduction cost) less an adjustment for both present

age and condition. In determining a "reasonable balance," the agency may consider inflation, deflation, quality of service being provided, the growth rate of the service areas, and the need for the utility to attract new capital.

After the regulatory agency has determined the rate base, its next task is to fix the rate of return. The rate of return is the sum of money that a utility is allowed an opportunity to earn, over and above operating expenses, depreciation, and taxes. The rate of return is expressed as a percentage of the utility's rate base. Butler, *The Rate of Return in Texas–The Neglected Issue*, 28 Baylor L.Rev. 937, 938 (1976).

The rate of return, of course, is not specified in Art. 1446c as any exact percentage. Rather, two back-to-back sections of the Act, § 39 and § 40(a), provide that the rate of return shall consist of at least a reasonable return on invested capital, but not more than a fair return on the adjusted value of invested capital. *See Southwestern Bell Telephone Company v. Public Utility Commission, supra.*

■ To achieve the rate of return that a utility should be allowed to earn, the regulatory agency considers the cost to the utility of its capital expressed as (1) interest on long-term debt; (2) dividends on preferred stock; and (3) earnings on common stock. Each of the elements of the capital structure of the utility is given a weighting based upon the company's capital structure to arrive at a composite rate of return. The composite rate of return is then applied to the utility's rate base to arrive at the proper amount of return. Garfield & Lovejoy, *Public Utility Economics*, 116 (1964).

In calculating the rate of return, the costs of long-term debt capital and preferred stock capital may be ascertained with relative ease. The cost of debt capital is the interest rate contractually agreed upon by the investor and the utility. Likewise, the cost of preferred stock is the dividend percentage agreed upon by the utility and the investor. Both such costs are predetermined contractually and, accordingly, do not fluctuate. The cost of common stock capital, however, is more controversial because with common stock, there is no contractual interest rate or fixed-dividend rate. The determination of cost of common stock capital is a matter of judgment subject to varying expert opinion.

Several methods are used currently by rate of return experts to estimate the cost of common stock capital. Two methods are: (1) comparable rates of earnings of other companies and (2) the past price earnings ratio of the utility's common stock.

■ With respect to the case at bar, the Railroad Commission in its order adopted the hearing examiner's proposal for decision. The proposal for decision shows that the examiner made a determination of the rate of return upon original cost-less depreciation which he judged sufficient to attract capital. The examiner then translated that monetary sum into a percentage figure of adjusted value base (§ 41(a)) so that the dollar return would exactly equal the predetermined dollar return upon original cost-less depreciation. In different words, although the gas company established the statutory adjusted value rate base, the examiner, by an offsetting rate of return, allowed exactly the same annual dollar return to which the company would have been entitled on an original cost basis. The genesis of the examiner's determination is found in the colloquy between the examiner and the cities' witness, Jack Hopper, and appears in the margin of this opinion.[1]

1. "Q (Mr. Examiner) . . . Dr. Hopper, are you recommending that the Railroad Commission ignore the requirement of section 41 of the public utilities regulatory act that a rate base be selected which would include a portion of the invested capital rate base and a portion of the current cost rate base?

"A (Dr. Hopper) No, sir. I'm not ignoring that. I just didn't develop a rate of return for the adjusted value of capital rate base.
"Q So, are you—in other words, are you saying that the rate base that you've developed is not designed to be applied to this statutorily dictated rate base?

The gas company contended, and the district court concluded, that the Commission erred in fixing an offsetting rate of return that allowed exactly the same annual dollar return to which the company would have been entitled on an original cost basis, all in violation of § 41(a).

In briefs and in oral argument the parties to this appeal agreed that the identical problem was at issue in *Railroad Commission of Texas, et al. v. Entex, Inc.*, 599 S.W.2d 292 (Tex.), a direct appeal from the district court of Travis County. The Supreme Court delivered its opinion in that appeal on April 2, 1980. The majority of the Court in *Entex* took the view that so long as the agency determines an adjusted value rate base, it may consider the "return to book common equity" in its consideration of the rate of return to be applied to the adjusted value rate base.

Surely it is proper, as the majority in *Entex* states, for the agency to consider the rate to book common equity in the formulation of the composite rate of return to be applied to the statutory rate base. What the majority of the Court failed to appreciate is that the Commission, through its examiner, not only considered the return to book common equity, but made that consideration *totally determinative* of the rate of return. Original cost-less depreciation, dressed in borrowed robes as "return to book common equity," gained the day. Justice Pope in his knowledgeable dissenting opinion graphically illustrated this truth.

The Commission's stratagem, as condoned by *Entex*, reduces the agency hearing to determine the adjusted value rate base to a *tableau vivant* where the examiner, witnesses, and attorneys expend wind, words, and wisdom for naught. For naught because the return to book common equity will have been ascertained in advance and will be, in fact, *all-determinative* in the end,

no matter what adjusted value rate base may be established. No facts, except those proving original cost-less depreciation, need be adduced in the hearing because facts proving the other component of adjusted value will not make any difference in the amount of revenue allowed the company. The determination of adjusted value commanded by § 41(a) is shrunk thereby to a meaningless and expensive ritual, paid lip homage by the Commission solely for purposes of judicial review.

The advantages of an original cost rate base, as against a current cost rate base, doubtless were considered by the legislature prior to the enactment of § 41(a). It is true that the original cost rate base concept is espoused by the Federal Power Commission, most state utility commissions, and eminent utility economists. Bonbright, *Principles of Public Utility Rates* (1961). Nevertheless, the legislature in enacting § 41(a) chose to rely neither upon the original cost nor the current cost rate base, but instead, struck a balance between the two.

∎ It is not for administrative agencies, or courts, to weigh the wisdom of legislation and to ignore those parts of the statute not thought sound. Rather, their duty is to carry forward the directives of statutes. In *Entex*, the Commission deliberately circumvented the legislative will as expressed in § 41(a).

Courts sit in review of agency orders to insure that statutes are enforced, *not thwarted.*

As is apparent, this writer views *Entex* as wrongly decided; nonetheless, this Court is bound to heed that precedent. The judgment of the district court is reversed and judgment is here rendered affirming the order of the Railroad Commission.

"A The rate of return that I recommended is not to be applied directly to the adjusted value of invested capital rate base.

"Q What method—by what method are you recommending that your rate of return be applied to the so called fair value, or adjusted value rate base?

"A Well, if I were going to do it, and I didn't do it, if I were going to do it I would determine the earnings requirement on the invested capital rate base, and I would convert that—that identical earnings requirement to a rate of return on the adjusted value rate base."

SMITH, Justice, concurring.

I strongly concur in the opinion expressed.