TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00495-CV







John Henry Pelt and John Kyle Pelt, Appellants



v.



State Board of Insurance, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT


NO. 91-6615, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING








 John Henry Pelt and John Kyle Pelt, doing business under the trade name Aztec
General Agency, sued for judicial review of a final order issued by the State Board of Insurance. 
The order revoked licenses held by the Pelts under the Texas Insurance Code. See Tex. Ins. Code
Ann. arts. 1.14-2 (Surplus Lines Insurance), 21.07-1 (Legal Reserve Life Insurance Agents;
Examination; Licenses), 21.07-3 (Managing General Agents' Licensing Act), 21.14 (Licensing
of Local Recording Agents and Solicitors), 21.15 (Revocation of Agent's Certificate) (West 1981
& Supp. 1995). The trial-court judgment affirmed the agency order. We will affirm the trial-court judgment.



THE CONTROVERSY


 In January 1986 the Pelts purchased all the capital stock of American Surety
Company, a foreign corporation not authorized to do business in Texas. John Henry became
chairman of the board of directors, while John Kyle became a director and secretary of the
corporation. Aztec General Agency, an agency managed and controlled by the Pelts, entered into
a "fronting arrangement" or agency agreement in which American Surety gave Aztec authority
to act in American Surety's behalf. From March 1986 to August 1987, the Pelts, through Aztec,
placed with American Surety approximately 260 payment and performance bonds, including
several bonds issued on public-works projects. American Surety's resulting liability totalled about
twenty million dollars.

 In September 1989 the State Board of Insurance (1) initiated against the Pelts a
disciplinary action, alleging they placed surety bonds in an ineligible surplus-lines insurer, (2)
committed various acts of misrepresentation, misappropriation, fraud and dishonesty in violation
of the Texas Insurance Code, and violated article 5160 of the Texas Revised Civil Statutes by
placing public-works bonds in a surplus-lines insurer. Act of May 26, 1989, 71st Leg., R.S., ch.
1138, § 38, 1989 Tex. Gen. Laws 4693, 4704 (Tex. Rev. Civ. Stat. Ann. art. 5160, since
amended). After a hearing on August 24, 1990, the Commissioner revoked the Pelts' licenses. 
The Commissioner later modified his order to suspend the Pelts' licenses for a twelve-month
period. The Pelts appealed the order of suspension to the three-member panel of the Board. On
March 25, 1991, the Board revoked the Pelts' licenses. The Pelts sued for judicial review in
district court. After a trial de novo, (3) the district court affirmed the Board order. 

 In four points of error, the Pelts complain the trial court erred in revoking their
insurance licenses because there was no evidence to support the court's conclusions that: (1)
American Surety was an ineligible surplus-lines carrier; (2) the Pelts violated article 5160; (3) the
Pelts gave false financial statements with the intent to deceive; and (4) the Pelts demonstrated a
lack of trustworthiness and competence or were guilty of fraudulent and dishonest acts.




DISCUSSION AND HOLDINGS


I.


 As a threshold matter we must address the Board's cross-point of error regarding
the appropriate manner and scope of review. House Bill No. 2, which became effective while the
Pelts' suit was pending in the trial court, changed the manner and scope of review from trial de
novo to substantial-evidence review. See Act of May 27, 1991, 72d Leg., R.S., ch. 242, § 1.02,
1991 Tex. Gen. Laws 939, 941 (Tex. Ins. Code Ann. art. 1.04(f) (West Supp. 1995)) (hereinafter
"H.B. No. 2").

 The Board argues the trial court was confined to a substantial-evidence review,
citing section 13.30 of H.B. No. 2: "Except as provided by Subsection (b) of this section, this
Act takes effect September 1, 1991." Id. § 13.30. The Pelts argued the effective date was
controlled by section 13.08, which provided as follows:



The changes made by this Act to the application of the Administrative Procedure
and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes) and to
the participation of State Board of Insurance staff members in rate proceedings
apply only to proceedings before the State Board of Insurance commenced on or
after January 1, 1992. Proceedings commenced before January 1, 1992, are
governed by the law as it existed immediately before the effective date of the Act,
and that law is continued in effect for that purpose.



Id. § 13.08 (emphasis added). The Board urges that the use of the conjunctive "and" instead of
the disjunctive "or" evidences the legislature's intention to modify and limit both clauses
preceding the phrase "in rate proceedings"; the first clause being that which refers to "changes
made by this Act to the application of [APTRA]" and the second clause being "participation of
State Board of Insurance staff members." To bolster its argument, the Board asserts that rate
reform was the main thrust of the extensive changes made to the Insurance Code by H.B. No. 2. 
We note, however, that rate reform comprised only a portion of the revisions. (4)

 The Board argues further that at the time disciplinary action was brought against
the Pelts, license revocation proceedings were initiated before the Commissioner, and were then
appealed to the Board, unlike rate hearings which were initiated before the Board. In its brief,
the Board states: "Surely, if the legislature had intended to exclude from substantial evidence
review all actions currently pending before the agency, it would have tied the effective date in
section 13.08 to the inception of the administrative proceeding--that is, to the commencement of
the action at the agency level."

 We are unconvinced that the plain meaning of section 13.08 dictates that "changes
in the application of [APTRA]" are limited solely to those changes involving rate proceedings,
although the section is not completely clear. See E.A. Driedger, Legislative Drafting, 27
Canadian Bar Rev. 291 (1949), reprinted in 1A Norman J. Singer, Statutes & Statutory
Construction 645, 653-54 (5th ed. 1993) (ambiguity may be avoided by repeating qualifying word
or rearranging words). The second clause would not make sense without the phrase "in rate
proceedings" or a similar phrase, while the first clause standing alone requires no modification. 
We hold that because this proceeding began in the Board before January 1, 1992, the "law as it
existed immediately before the effective date of this Act" governs. Thus, de novo review was
required. We overrule the Board's first cross-point of error. 

II.


 In their first point of error, the Pelts complain there is no evidence to support the
trial court's conclusions of law numbers 2 through 8 (5) because the statutory framework as it existed
in 1986 and 1987 granted the surplus-lines agent, rather than the Board, the authority to determine
whether the surplus-lines insurer was "eligible." (6) The Pelts argue that by adding sections 3A and
17A and amending section 8 of article 1.14-2 of the Insurance Code in 1987, (7) the Legislature
intended to end self-regulation, and thereafter authorized the Board to determine the eligibility and
suitability of surplus-lines insurers. The State Board of Insurance responds it has always
possessed authority to determine the eligibility and suitability of surplus-lines insurers and to
promulgate rules in that regard pursuant to article 1.14-2 of the Insurance Code. Tex. Ins. Code
Ann. art. 1.14-2 (West 1981 & Supp. 1995).

 We disagree with the Pelts' theory that the Board was without authority to
supervise and regulate surplus-lines insurers. The Board possessed express rulemaking authority
before the enactment of the 1987 amendments. See Tex. Ins. Code Ann. art. 1.04(b) (West 1981)
(Board authorized by Insurance Code to "determine policy, rules, rates and appeals, but otherwise
it shall execute its duties through the Commissioner of Insurance as herein provided, in
accordance with the laws of this state and the rules and regulations for uniform application as
made by the Board"); see also id. § 1.04(c).

 Section 1 of article 1.14-2, which sets forth the purposes of the article, refutes the
Pelts' theory that the determination to place insurance with an unauthorized carrier rests solely
with the surplus-lines agent in that it requires surplus-lines insurers to follow certain guidelines
and submit required reports to the Board. Tex. Ins. Code Ann. art. 1.14-2, § 1 (West 1981 &
Supp. 1995). (8) The statute provides further that surplus-line agents be "qualified, licensed and
supervised." Id.

 Moreover, article 1.10, section 7 provides expressly that one of the Board's duties
is to order sanctions after notice and hearing if a licensee "is found to be in violation of, or failed
to comply with, specific provisions of the Code or any duly promulgated rule or regulation of the
State Board of Insurance." Tex. Ins. Code Ann. art. 1.10, § 7 (West 1981). Under this
authority, the Board "may cancel or revoke any permit [or] license." Id.

 The Pelts assert that "the State Board of Insurance is an agency with limited
authority" which may not act unless given authority to act by the Legislature in "clear and
unmistakable terms." See Key W. Life Ins. Co. v. State Bd. of Ins., 350 S.W.2d 839, 848 (Tex.
1961) (Board only empowered to determine whether form submitted for its approval meets specific
standards prescribed by statute); Board of Ins. Comm'rs v. Guardian Life Ins. Co., 180 S.W.2d
906, 908 (Tex. 1944) (Board without authority to require greater reserves than those mandated
by statute). Key Western and Guardian Life are distinguishable. Both refer to statutes that
prescribe explicitly what the Board could and could not do in its regulation. In the present cause,
the legislature granted specific powers and duties, but provided only general guidelines for the
Board to follow in carrying out the specific powers and duties, implicitly leaving to the Board the
promulgation of rules necessary to fill the interstices.

 For example, section 7 of article 1.10 expressly grants the Board a specific power
to impose sanctions on licensees for specific code violations. We must therefore ascertain the full
extent of that power "with due regard for the rule that the Legislature generally intends that an
agency should have by implication such authority as may be necessary to carry out the specific
powers delegated, in order that the statutory purpose might be achieved." Sexton v. Mount Olivet
Cemetery Ass'n, 720 S.W.2d 129, 137 (Tex. App.--Austin 1986, writ ref'd n.r.e.). 

 Section 3 of article 1.14-2 provides that insurance may be procured from
unauthorized insurers provided the insurer is an eligible surplus-lines insurer under section 8 of
article 1.14-2. Tex. Ins. Code Ann. art. 1.14-2, § 3(a)(2) (West 1981 & Supp. 1995). Section
8, governing the eligibility of surplus-lines insurers, mandates that "[a] surplus lines agent shall
not knowingly place surplus lines insurance with financially unsound insurers"; "[a]n insurer shall
not be eligible unless it has capital and surplus or its equivalent that is adequate in relation to its
premium writings and the exposure it assumes"; "[t]he unauthorized insurer must be of good
repute"; and the management of an unauthorized insurer must be competent and trustworthy. (9) Id.
§ 8 (a), (b), (c). Section 8, however, does not require that the State Board "determine the actual
financial condition or claims practice of any unauthorized insurer." Id. § 8(f). (10)

 By necessary implication, the Board must have sufficient authority to implement
section 8 of article 1.14-2, including the authority to determine the meaning of the word
"eligible." Because the Legislature required that surplus-lines insurers have "adequate" capital
in order to be "eligible," it necessarily gave the Board discretion to determine the meaning and
content of those terms. See Railroad Comm'n v. Highway Ins. Underwriters, 124 S.W.2d 413,
414 (Tex. Civ. App.--Austin 1939, no writ). In promulgating Board Order Number 38530, the
Commission acted in harmony with the general objectives of article 1.14-2. See Gerst v. Oak Cliff
Sav. & Loan Ass'n, 432 S.W.2d 702, 706 (Tex. 1968) (critical factor in determining whether
agency has exceeded its rulemaking authority is whether rule harmonizes with general objectives
of the statute); see also State Bd. of Ins. v. Deffebach, 631 S.W.2d 794, 798 (Tex. App.--Austin
1982, writ ref'd n.r.e.). 

 We conclude the Board was authorized to determine the eligibility of surplus-lines
insurers during the time the Pelts were placing bonds with American Surety. Therefore, if any
evidence supports the Board's conclusion that the Pelts placed insurance with an ineligible surplus-lines carrier, we must overrule their first point of error. See In re King's Estate, 244 S.W.2d at
661. 

 The evidence shows that John Henry wrote to the surplus-lines division of the
Board on February 20, 1986, requesting that American Surety be placed on the Board's list of
unauthorized insurers. John Henry's letter contained a financial statement of American Surety's
purported worth as of January 31, 1986. On March 24, 1986, Richard Schoeter, the division
director, replied that American Surety could not be placed on the unauthorized insurers list until
American Surety provided a certified financial statement by an accredited accounting firm, and
biographical information on its officers. On May 19, 1986, the Pelts sent a "Report of
Certification" written by Carlos W. Simmons, American Surety's counsel in the Turks and Caicos
Islands, stating that Simmons had examined American Surety's balance sheet as of January 31,
1986 "in accordance with generally accepted standards including such tests of the records and
other procedures as we considered necessary in the circumstances." He added that the
certification was "in conformity with generally accepted examination principles applied on a basis
consistent with that required by the Registrar of Companies." Schoeter responded, stating that
American Surety could not be recognized as an eligible insurer because the Board still lacked the
information requested. 

 Additionally, Schoeter informed the Pelts that he had received information that the
Pelts had placed a bond with American Surety; Schoeter requested an explanation within ten days. 
When Schoeter did not receive a reply, he sent another letter dated July 15, 1986, requiring an
explanation as to why bonds were being placed with American Surety and requesting that no new
bonds be placed. The Pelts forwarded this letter to their attorney in Texas, Hector De Leon. De
Leon replied to Schoeter's letter by inquiring why the Pelts could not continue to issue bonds. 
Schoeter answered that the Pelts had failed to meet the requirements of article 1.14-2 and the
Board-approved rules pertaining to this section. On August 1, 1986, the Pelts provided the Board
with a "Report of Examination" prepared by certified public accountants Dohm & Wolff, which
stated that the financial statement previously provided to the Board, purporting to assess American
Surety's financial position as of January 31, 1986, did "not present fairly the financial position
of American Surety . . . in conformity with generally accepted accounting principles." By August
1987 the Pelts had placed over 260 bonds with American Surety totalling approximately twenty
million dollars. Dohm & Wolff found substantial mistakes in the first financial report sent to the
Board. For example, the Pelts listed American Surety's assets as $3,836,085, while Dohm &
Wolff found only $3,125,735 in assets. The Pelts calculated their liabilities to be only $757,992,
while Dohm & Wolff calculated total liabilities to be $2,626,416. 

 Subsequently, the Board appointed Edward E. Kubala to supervise American Surety
and later appointed R.B. Ashworth as conservator to take control of the company. At this point,
the Board's financial examiners determined that certain items listed as assets by the Pelts were
either non-existent or were not registered in American Surety's name. For example, American
Surety had listed approximately one hundred letters of credit issued in favor of Aztec General
Company or other companies owned and operated by the Pelts. Even if these letters of credit had
been issued in American Surety's name, they could not be considered assets without a
corresponding liability because the money under the letters of credit became available only upon
a failure on the bond. (11) 

 American Surety also listed as an asset certain real estate the Pelts valued at
$1,300,000, encumbered by a deed-of-trust lien securing a debt in the amount of $732,743. 
However, the Aztec Financial Services actually owned the real estate. The lien was later
foreclosed and the property sold at a trustee's sale for $281,250, leaving a substantial deficiency
owing. 

 American Surety also listed as an asset an oil and gas lease, claimed to be worth
$499,500, assigned to American Surety by Aztec Financial Services. The lease had a primary
term of two years and so long thereafter as oil or gas was produced in paying quantities. There
was no indication that the lease had ever produced any income. Taking these and other
discrepancies into account, the Board ascertained the Pelts' total assets were actually worth only
$637. At the same time, the Board discovered American Surety's liabilities had dramatically
increased due to pending lawsuits. 

 We conclude the trial court ordered the Pelts' licenses revoked on the basis that
they had written insurance in an ineligible surplus-lines insurer. The court could reasonably
conclude from the evidence that assets worth $637 were inadequate in relation to premium
writings of approximately twenty million dollars. We overrule the Pelts' first point of error. 

 In light of our disposition of the Pelts' first point of error, it is unnecessary to reach
their remaining points. We affirm the trial-court judgment. 



 


 John Powers, Justice

Before Justices Powers, Kidd and B. A. Smith

Affirmed

Filed: August 16, 1995

Do Not Publish
1.   Now the Texas Department of Insurance. See Act of May 27, 1991, 72d Leg., R.S., ch.
242, § 1.02, 1991 Tex. Gen. Laws 939, 941 (Tex. Ins. Code Ann. art. 1.01A, since
amended).
2.   An eligible surplus lines insurer is an unauthorized carrier that may provide coverage to
a citizen of the state who cannot, after diligent effort, obtain coverage from authorized
carriers. Surplus lines insurers are subject to the requirements of article 1.14-2 of the
Insurance Code. Tex. Ins. Code Ann. art. 1.14-2, § 3 (West 1981 & Supp. 1995) & § 5
(West 1981).
3.   The appellate record reflects that the trial court tried all issues of fact and law, receiving
and weighing evidence, finding facts, and applying the law as in an ordinary civil case. In
short, the trial court decided the controversy after a trial de novo. See Administrative
Procedure and Texas Register Act (APTRA), 64th Leg., R.S., ch. 61, § 19, 1975 Tex. Gen.
Laws 136, 146-47 (Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19(c), (e), since repealed and
codified at Tex. Gov't Code Ann. § 2001.173 (West 1995)). In addition, however, the
appellate record indicates that the trial court required the Board to transmit to the trial court a
copy of the agency record, to which the court apparently confined its review in arriving at a
decision, "other than by trial de novo," to affirm the agency decision. That is to say, the trial
court affirmed the agency decision after "substantial-evidence" review as prescribed in
APTRA § 19(d), (e), since repealed and codified at Tex. Gov't Code Ann 2001.174 (West
1995). In its judgment, the trial court declared that the "court is of the opinion that both
substantial evidence and a preponderance of the credible evidence supports [sic] revocation of
any and all insurance-related licenses held by the Pelts." Judicial review by trial de novo and
substantial-evidence review are, of course, inherently antithetical in their manner and scope of
review. See Railroad Comm'n v. Entex, Inc., 599 S.W.2d 292, 298 (Tex. 1980); Southern
Canal Co. v. State Bd. of Water Eng'rs, 318 S.W.2d 619, 622-25 (Tex. 1958). We therefore
regard as surplusage that part of the trial-court judgment that refers to substantial-evidence
review.
4.   In fact, H.B. No. 2 is described generally as "An Act relating to the regulation of the
insurance industry, the punishment for certain criminal offenses relating to the business of
insurance, maintaining motor vehicle financial responsibility, and creating certain offenses." 
Id. at 939.
5.   Conclusions of law 2 through 8 provide as follows:


2. At the time the Pelts placed the surety bonds with American Surety
Company, as described in Finding of Fact Nos. 9 and 12, American Surety
Company was not an eligible surplus lines carrier, because it did not have
capital and surplus, or its equivalent, that was adequate in relation to its
premium writings and the exposure it assumed, as contemplated in Tex. Ins.
Code Art. 1.14-2, § 8(a). 

3. At the time the Pelts placed the surety bonds with American Surety
Company, as described in Finding of Fact Nos. 9 and 12, American Surety
Company was not an eligible surplus lines carrier, because it did not have
competent or trustworthy management, as contemplated in Tex. Ins. Code
Art. 1.14-2, § 8(c). 

4. At the time the Pelts placed the surety bonds with American Surety
Company the State Board of Insurance was authorized to determine the
eligibility of surplus lines carriers and to promulgate rules and regulations
for surplus lines carriers, pursuant to Tex. Ins. Code Arts. 1.04(b), 1.14-2,
§§ 1 and 8. 

5. At the time the Pelts placed the surety bonds with American Surety
Company, as described in Finding of Fact Nos. 9 and 12, American Surety
Company had not been deemed an eligible surplus lines carrier by the State
Board of Insurance, as contemplated in Tex. Ins. Code Art. 1.14-2, §§ 1
and 8. 

6. The Pelts knowingly placed surplus lines insurance with a financially
unsound insurer in violation of Tex. Ins. Code Art. 1.14-2, § 8(a). 

7. American Surety Company was not authorized to transact the business of
insurance in the State of Texas, as contemplated in Tex. Ins. Code Art.
1.14-1.

8. Because American Surety Company was neither authorized to transact the
business of insurance in the State of Texas, nor eligible to act as a surplus
lines carrier, the Pelts violated Tex. Ins. Code Art. 1.14-1, §§ 2 and 3,
which prohibit engaging in unauthorized insurance. 
6. We are constrained in reviewing no evidence points to consider only the evidence and
inferences that tend to support the findings and disregard all the evidence and inferences to the
contrary. Weirich v. Weirich, 833 S.W.2d 942, 945 (Tex. 1992); Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965). See generally William Powers, Jr. & Jack Ratliff, Another
Look at "No Evidence" and "Insufficient Evidence," 69 Tex. L. Rev. 515 (1991). If any
evidence supports the finding, we must overrule the point and uphold the finding. In re King's
Estate, 244 S.W.2d 660, 661 (Tex. 1951).
7.   Section 3A provides that "[t]he State Board of Insurance may promulgate rules to
enforce this article. The board shall monitor the activities of surplus lines agents to the extent
necessary to protect the public interest." Tex. Ins. Code Ann. art. 1.14-2, § 3A (West Supp.
1995).

 The amendments to section 8 set forth monetary guidelines for capital and surplus
requirements instead of requiring only that capital and surplus be "adequate." See Act of June
3, 1987, 70th Leg., 1st C.S., ch. 1, sec. 5.04, § 8, 1987 Tex. Gen. Laws 1, 17-18 (Tex. Ins.
Code Ann. art. 1.14-2, § 8, since amended). 

 Section 17A provided in part that "[i]f a surplus lines agent violates Section 8 of this
article or a rule, regulation, or order adopted under that provision, the State Board of
Insurance may assess a penalty against that agent as provided by Section 7, Article 1.10, of
this code." See Act of June 3, 1987, 70th Leg., 1st C.S., ch. 1, sec. 5.05, § 17A, 1987 Tex.
Gen. Laws 1, 18 (Tex. Ins. Code Ann. art. 1.14-2, § 17A, since amended).
8.   Section 1 of article 1.14-2 provides as follows:


Insurance transactions which are entered into by citizens of this state with
unauthorized insurers through a surplus lines agent as a result of difficulty in
obtaining coverage from licensed insurers are a matter of public interest. The
Legislature declares that such transaction of surplus lines insurance is a subject of
concern and that it is necessary to provide for the regulation, taxation,
supervision and control of such transactions and the practices and matters related
thereto by requiring appropriate standards and reports concerning the placement
of such insurance; by imposing requirements necessary to make such regulation
and control reasonably complete and effective . . . . In order to properly regulate
and tax such unauthorized insurance within the meaning and intent of . . . [the
article], the Legislature herein provides an orderly method for the insuring public
of this state to effect insurance with unauthorized insurers through qualified,
licensed and supervised surplus line agents in this state and under reasonable and
practical safeguards so that such intent that the coverage is not procurable from
duly licensed, regulated insurers conducting business in this state. 

Tex. Ins. Code Ann. art. 1.14-2, § 1 (West 1981) (emphasis added).
9.   Pursuant to its rulemaking authority, the Board promulgated Board Order Number 38530
regarding the eligibility and suitability of surplus lines insurers. See 88 Tex. Reg. 4759
(1980) (proposed) and 15 Tex. Reg. 770 (1981) (adopted), since amended and codified at 28
Tex. Admin. Code §§ 15.7, .8, .13, .23 (1995). Order Number 38530 followed generally the
language in article 1.14-2, section 8 concerning eligibility. In addition, section 8 provided as
follows:


[T]he suitability of each unauthorized insurer underwriting or proposing to
underwrite surplus lines risks in Texas is subject to the continuous scrutiny and
discretion of the State Board of Insurance. . . . In order to establish the
suitability of any unauthorized insurer for writing surplus lines insurance, the
commissioner may request information from the surplus lines agent concerning an
unauthorized insurer. The information requested may include but is not limited to
recent financial statements, domestic trust agreements, powers of attorney, and
biographies of the owners and the management.
10. The Pelts claim section 8(f) evidences the legislature's intent to allow self-regulation of
the surplus-lines insurance industry in 1986 and 1987, while the Board interprets section 8(f)
to be a disclaimer of any liability to purchasers of surplus-lines insurance that relied on the
Board's determination of eligibility. See Tex. Ins. Code Ann. art. 1.14-2, § 7 (West 1981). 
We believe the Pelts infer too much from the section.
11. Principals on the surety bond were required to obtain letters of credit as collateral; if
American Surety became liable on a bond, the letters of credit would cover the loss.