# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-07-00730-CV
---

**Appellant, Pioneer Natural Resources USA, Inc. // Cross-Appellant,
Cap Rock Energy Corporation**

**v.**

**Appellees, Public Utility Commission of Texas and Cap Rock Energy Corporation
// Cross-Appellees, Public Utility Commission of Texas and
Pioneer Natural Resources USA, Inc.**

---
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
NO. D-1-GN-06-000282, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**
---

## O P I N I O N

This case is an administrative appeal of a rate order of the Public Utility Commission of Texas that set the rates of Cap Rock Energy Corporation, an electric utility. The district court affirmed the final order of the Commission. Pioneer Natural Resources USA, Inc., an intervenor in the administrative case before the Commission, appeals the judgment, asserting that the Commission erred by including 35% of the cost of a computer system in Cap Rock's rates, by approving a capital structure of 75% debt and 25% equity, by adopting a rate of return on equity of 11.75%, and by approving the reimbursement of certain rate case expenses. Cap Rock also argues that the Commission erred by imposing a per-kilowatt discount for a certain sub-class of Cap Rock's customers. The district court affirmed the Commission's final order. We affirm the judgment of the district court.

*Factual and Procedural Background*

Cap Rock has provided electric service to consumers in northern and western Texas for many years. Cap Rock operated as an electric cooperative and as an investor-owned utility. In 2003, due to amendments to the Public Utility Regulatory Act (PURA), Cap Rock became subject to the rate-setting jurisdiction of the Commission. *See* Act of May 16, 2003, 78th Leg., R.S., ch. 1327, 2003 Tex. Gen. Laws 5010, 5010.

On October 24, 2003, Commission Staff filed a petition inquiring into Cap Rock's electric utility rates and services. After the Staff ordered Cap Rock to submit a full rate-filing package, Cap Rock filed a statement of intent with the Commission seeking to change its rate schedules such that its rates would increase. Electric utility rates are established through a regulatory process with a goal of permitting the utility "a reasonable opportunity to earn a reasonable return." *See* Tex. Util. Code Ann. § 36.051 (West 2007). In this process, the Commission must quantify the utility's invested capital used and useful in providing service to the public, the appropriate rate of return on that invested capital, and the utility's reasonable and necessary operating expenses:

> In establishing an electric utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses.

*Id.*; *see also id.* § 36.052 (West 2007) (establishing reasonable return), § 36.053 (West 2007) (components of invested capital), § 36.057(c) (West 2007) (authorizing rulemaking regarding

allowable expenses). The Commission referred the Cap Rock contested case to the State Office of Administrative Hearings (SOAH) on February 26, 2004.

Pioneer filed a motion to intervene in the proceeding, asserting that it was an independent oil and gas producer with production facilities in Cap Rock's service area, it was a customer of Cap Rock, and it purchased large quantities of electric power and energy under several of Cap Rock's rate classifications. In March 2004, Pioneer was granted leave to intervene. The SOAH administrative law judges issued their proposal for decision on March 16, 2005. The Commission then issued its final order on November 10, 2005, adopting the proposal for decision with some modifications, and approving rates to be charged by Cap Rock.

Both Pioneer and Cap Rock filed suit in district court in January 2006, appealing portions of the Commission's order. *See id.* § 15.001 (West 2007). The cases were consolidated. On November 16, 2007, the district court affirmed the Commission's final order in all respects. Pioneer and Cap Rock separately appeal the judgment of the district court.

### Standard of Review

This appeal concerns the propriety of the Commission's order, including its findings and conclusions. When reviewing these types of determinations, we employ the substantial-evidence standard to ascertain whether the Commission's actions are adequately supported by the evidence presented. *See id.* (substantial-evidence standard applies to judicial review of Commission's proceedings); Tex. Gov't Code Ann. § 2001.174 (West 2008) (allowing court to reverse agency determination if not reasonably supported by substantial evidence).

Under this standard, we are prohibited from substituting our judgment for the Commission's "as to the weight of the evidence on questions committed to agency discretion." *Cities of Abilene v. Public Util. Comm'n*, 146 S.W.3d 742, 748 (Tex. App.—Austin 2004, no pet.). The Commission "is the sole judge of the weight to be accorded the testimony of each witness," *Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied), and "may accept or reject in whole or in part the testimony of the various witnesses who testify," *Cities of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 695 (Tex. App.—Austin 2005, pet. denied). We are not asked to determine whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the agency's action. *See id.* In fact, even if the evidence actually preponderates against the Commission's finding, that finding may be upheld as long as there is enough evidence to suggest that the Commission's determination was within the bounds of reasonableness. *Id.* We will sustain the Commission's order if the evidence is such that reasonable minds could have reached the conclusion that the Commission must have reached in order to justify its action. *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 453 (Tex. 1984).

### Pioneer's Points on Appeal

Pioneer appeals the following components of the Commission's final order approving Cap Rock's rates: (1) inclusion of 35% of the cost of a partially installed computer system in Cap Rock's rates; (2) adoption of a capital structure of 75% debt and 25% equity; (3) adoption of an 11.75% rate of return on equity; and (4) reimbursement of expenses incurred by Cap Rock in connection with two of its witnesses in the rate case.

4

*Computer System Costs*

Pioneer asserts that the Commission erred by allowing Cap Rock to recover 35% of the cost of its purchased computer system in its rates. Pioneer contends that none of the system's cost should have been included as costs in setting Cap Rock's rates.

Cap Rock purchased a fully outsourced information technology (IT) system for accounting and customer billing, consisting of software, hardware, installation, maintenance, and ongoing operational services. The system was purchased from Delinea Corporation, and the various IT functions were also outsourced to Delinea. In the administrative proceeding, Cap Rock sought to include in its rate base and cost of service approximately $3.1 million in payments for the system, $870,000 in amortization expenses, and $1.6 million in annual operation and maintenance expenses. In its order, the Commission determined that the IT system was "necessary to system reliability and the ability to operate in the complex electric marketplace," that outsourcing was an acceptable approach for Cap Rock to meet its IT requirements, and that 35% of the system's cost was reasonable and necessary.

First, Pioneer argues that the purchase of the IT system was not "reasonable and necessary" and the purchased system "used and useful" and, therefore, that no portion of the system's cost should be included in Cap Rock's rates. Pioneer contends that the system is "massively oversized" for Cap Rock's current ratepayers and was only acquired to support "highly speculative" future growth. An asset is "used and useful" if it is acquired in good faith and held for use in the reasonably near future in order to enable the utility to supply and furnish adequate and uninterrupted service. *See Cities for Fair Utility Rates v. Public Util. Comm'n*, 924 S.W.2d 933, 935 (Tex. 1996).

5

A Pioneer witness testified that an investment of the magnitude of the IT system in question was "extreme and excessive" for a utility the size of Cap Rock. A Cap Rock witness defended the size based on the company's plans to quadruple in size over the next four years, and alleged that the IT system would handle both Cap Rock's current IT needs and its future needs upon such a rapid expansion. There was also testimony, however, that such growth was speculative, as well as testimony from a Pioneer witness to the effect that the system would be oversized even if Cap Rock quadrupled in size.

In response to testimony questioning the reasonableness of the IT system's cost as well as the need for the system, a Cap Rock witness testified that a new IT system was required in connection with Cap Rock becoming an investor-owned utility. Regarding the system's cost, another Cap Rock witness testified that the new IT system was obtained for a "very reasonable and very competitive price," that when taking the entirety of the IT system into account the cost was comparable to that paid by similarly sized utilities, and that the annual charges will be less than the average investor-owned utility spends for in-house IT services. In addition, the Cap Rock witness testified that the system would not be rendered obsolete over time because Delinea was responsible to keep software versions current, and that the system would be flexible enough to be modified in the event Cap Rock entered the Texas deregulated market. According to Cap Rock, the future expansion contemplated by Cap Rock did not result in an increase in the price Cap Rock paid for the system. Faced with this conflicting evidence, it was the Commission's responsibility to evaluate and determine the weight and credibility to give the evidence. *See Texas State Bd. of Med. Exam'rs v. Scheffey*, 949 S.W.2d 431, 437 (Tex. App.—Austin 1997, writ denied).

Pioneer also argues that the IT system was not prudently investigated because Cap Rock engaged Delinea to present bids and options for acquiring an IT system and then, after selecting the system, outsourced its operation to Delinea. We find no evidence in the record that Cap Rock's engaging Delinea both to research the types of IT systems that were available and to install and maintain the selected IT system actually selected amounted to some sort of a conflict of interest. We conclude that the Commission's determination that the IT system was "reasonable and necessary" and "used and useful"—at least in part—is supported by substantial evidence.

Even if Cap Rock's purchase of the IT system was reasonable and necessary, Pioneer argues that the 35% multiplier employed by the Commission—representing the portion of the system that was used and useful as to Cap Rock—is not supported by substantial evidence, and that as a result zero percent of the system's cost should instead be included in Cap Rock's rates.

The 35% multiplier actually is the product of two components: (1) a 70% figure attributable to the accounting treatment of the computer system cost; and (2) a 50% figure attributable to the portion of the computer system that was operational during the test year. Pioneer complains that no single witness or party explicitly proposed a 35% multiplier, or supported *both* the 70% figure and the 50% figure. However, even when no evidence suggests a specific figure explicitly, the Commission may infer the figure if it is supported by the body of evidence as to that issue. *See Public Util. Comm'n v. GTE-SW*, 833 S.W.2d 153, 159 (Tex. App.—Austin 1992), *aff'd in part, rev'd in part*, 901 S.W.2d 401 (Tex. 1995). Moreover, the Commission may "accept or reject in whole or *in part* the testimony of the various witnesses who testify." *Cities of Corpus Christi*, 188 S.W.3d at 695 (emphasis added). Separate witnesses testified regarding the 70% figure

7

and the 50% figure, and the Commission was entitled to accept both figures, regardless of whether there was any one witness who testified to both.

Pioneer contends that the 70% apportionment figure is not supported by substantial evidence. We disagree. Cap Rock indicated that both its regulated and non-regulated operations would be using the IT system. Cap Rock's accounting records demonstrated that 30% of Cap Rock's IT system costs had been allocated during the test year to Cap Rock's non-regulated transmission provider, NewCorp Resources Electric Cooperative, Inc. There was no other allocation percentage in the record. While it is true that a Staff witness indicated his suspicion that NewCorp's share might be larger, that witness conceded that the 30% figure could be employed as a "minimum." As a result, the Commission determined that only 70% of the cost of the IT system was eligible to be placed into Cap Rock's rate base.

Pioneer also disputes the 50% component of the IT system allowance. A Cap Rock witness testified that two software modules—general ledger and accounts payable—were installed and running during the test year, but that the other modules were still in the process of being installed. Both Staff and Cap Rock witnesses indicated that the installation of the two modules resulted in the system being 50% installed. As a result, the Commission determined that only 50% of the system was "used and useful."

Pioneer argues that the Commission's determination was arbitrary because there was no evidence that the installed 50% of the system equated to 50% of the system's cost. However, there was testimony to the effect that the system was purchased as a suite of applications and that there was no separate cost as to each module. Moreover, there is no indication in the record

8

that the price of the total system could have been priced in accordance with the separate modules. We decline to hold that absent evidence of per-module costs, the Commission was barred from authorizing reimbursement for modules that were found used and useful. The Commission has the discretion to determine the weight to be attributed to undisputed facts and the inferences to be drawn from those facts. *See Cities of Port Arthur v. Railroad Comm'n*, 886 S.W.2d 266, 270 (Tex. App.—Austin 1994, no writ). Our focus is on the reasonableness of the decision. We are not to set aside the Commission's chosen inference merely because we might believe another inference is more reasonable. *See id.*

Pioneer argues that the dual inference rule applies. The Texas Supreme Court has held that when circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred. *Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex. 1984). However, this rule applies when the evidence giving rise to two separate facts is "meager circumstantial evidence," which by itself is no more than a scintilla. *See id.* In this case, there was sufficient evidence that the system was purchased as a package and that 50% of the system had been installed. The Commission, as the fact-finder, was entitled to make the inference that 50% of the system's cost could reasonably be included in Cap Rock's rates.

Pioneer also argues that the Commission cannot rely on its own expertise, citing *Railroad Commission v. Lone Star Gas Co.*, 611 S.W.2d 911, 913 (Tex. Civ. App.—Austin 1981, writ ref'd n.r.e.). However, in *Lone Star Gas*, the Commission admitted that its use of a formula was "not supported by any evidence" in the record, and therefore its determination was based solely on

9

its own expertise. *See* 611 S.W.2d at 913. In contrast, in this case, there is evidence in the record that 50% of the system was used and useful, and eligible for inclusion in Cap Rock's rates.

Pioneer argues that the Commission, in selecting a percentage allowance, is limited to the range of options established in the record. *See Central Power & Light Co.*, 36 S.W.3d at 559. According to Pioneer, when the parties present polar recommendations of zero percent and one hundred percent, the Commission is not free to select any figure in the middle, but must select one or the other. This might be the case if no evidence in the record supported any figure between zero percent and one hundred percent. However, in this case, as we have discussed, both the 70% figure and the 50% figure are supported by substantial evidence. This is not a case, then, in which the Commission selected a figure that is outside the range of the applicable evidence, or that is otherwise unsupported by any evidence.

We conclude that the Commission did not err by including 35% of the cost of Cap Rock's purchased IT system in Cap Rock's rates.

*Capital Structure*

Pioneer asserts that the Commission erred by approving a hypothetical capital structure based on 75% debt and 25% equity. A utility's capital structure is used in determining the utility's rates. The percentage of debt capital and the percentage of equity capital—i.e. common stock and preferred stock—are each figures used in the formula that determines the appropriate rate of return, which percentage is in turn multiplied by the rate base—i.e. the utility's total, invested capital used and useful in providing service to the public—in order to calculate the revenue requirement to be allocated among the customers. *See* Tex. Util. Code Ann.

10

§ 36.051. In Cap Rock's case, a larger percentage of equity results in a higher rate of return and, consequently, higher rates.

According to a Cap Rock witness, Cap Rock started with a 96/4 debt-to-equity ratio, which existed due to cooperatives generally being financed mainly by debt, and due to Cap Rock's return of cash to certain former members. As of September 30, 2003, by having profitable operations, Cap Rock was able to reach a debt-to-equity ratio of approximately 83/17. Despite its actual capital structure of 83/17, however, Cap Rock proposed that a 60/40 capital structure be used in setting its rates, so that it might be able to in fact obtain such a structure.

Commission Staff recommended against using a hypothetical capital structure, arguing that Cap Rock's proposed 60/40 capital structure would result in a windfall funded through excessive rates charged to ratepayers, and that Cap Rock has neither sufficient equity for a 40% level in its capital structure nor the ability to raise additional equity. According to a Staff witness, Cap Rock did not adequately prepare its capital structure for its conversion to an investor owned utility, and its 83/17 debt-to-equity ratio was its own fault. Also, according to another witness, as a cooperative Cap Rock had experienced operating losses associated with three acquisition attempts in unrelated fields that failed for various reasons. While agreeing that a 60/40 ratio was an appropriate goal, the witness argued that the hypothetical ratio would result in higher retail rates despite Cap Rock's assertions during its conversion that rates would not increase as a result of the conversion. These witnesses agreed that the Commission should use Cap Rock's actual capital structure of 83/17 in setting Cap Rock's rates.

In response, the Cap Rock witness testified that Cap Rock has had to delay activities associated with restructuring its balance sheet because its regulatory uncertainty has adversely affected its ability to access additional equity. Cap Rock proposed a capital structure of 60% debt and 40% equity in order to strengthen its financial position and increase its access to funds. Cap Rock insisted that by using such a hypothetical capital structure in its rate-setting, it could achieve such a ratio in reality, because access to the equity market would follow from Cap Rock's use of the proceeds—obtained from the increased rates—to pay down its long term debt and to distribute annual dividends to both new and old shareholders. According to the Cap Rock witness, the requested rate increase could enable Cap Rock to achieve a 61/39 debt-to-equity ratio after only three years.

The Commission agreed with Staff that a 60/40 capital structure would give Cap Rock an excessive rate of return and would likely disproportionately benefit the same management team that had guided Cap Rock through significant losses due to the conversion process and failed business ventures. However, the Commission also agreed with Cap Rock that migrating toward a more balanced capital structure and retiring a portion of the company's debt would be prudent, and that applying a higher percentage of equity would help accomplish these goals. The Commission determined that a capital structure of 75% debt and 25% equity would be appropriate to allow Cap Rock to proceed in a "stepwise fashion," but required Cap Rock to apply all additional return resulting from the use of the hypothetical capital structure to retire debt. According to the Commission, failure to so apply the additional return would be viewed as "not only a violation of this Order, but also reflective of the quality of the utility's management."

12

Pioneer argues that the Commission is without authority to approve a capital structure that is hypothetical rather than actual. According to Pioneer, once the Commission is able to determine the utility's actual capital structure, it has no discretion to use another capital structure in the applicable rate-setting formula.

Pioneer cites utilities code section 36.051, which permits the utility the opportunity to "earn a reasonable return on the utility's invested capital used and useful in providing service to the public." *Id.* Pioneer contends that the term "invested capital" indicates that the allowable return must be based on the utility's actual capitalization, not a hypothetical capitalization. However, the Commission applied the debt and equity percentages in calculating the rate of return, not the "invested capital," which refers to the *total* amount of capital, both debt and equity. *See* 16 Tex. Admin. Code § 25.231(c)(2) (2009). The "rate of return" is multiplied by the "invested capital" to obtain the "return on invested capital." *See id.* § 25.231(c). Consequently, section 36.051's language does not prohibit the Commission from employing a hypothetical capital structure in setting the appropriate rate of return.

Pioneer contends that PUC Substantive Rule 25.231(c)(1)(C) requires the Commission to use the utility's actual cost of capital because it defines "cost of capital" as "the weighted average of the costs of the various classes of capital used by the electric utility." *Id.* § 25.231(c)(1)(C); *see also Railroad Comm'n v. Entex, Inc.*, 599 S.W.2d 292, 295 (Tex. 1980) (cost of capital is ratio of the two types of financing—debt and equity). However, the rule requires only that the Commission "shall *consider* the electric utility's cost of capital." 16 Tex. Admin. Code § 25.231(c)(1)(C) (emphasis added). The rule does not prohibit the Commission's departure from

the actual cost of capital. Pioneer does not dispute that the Commission did consider Cap Rock's actual capital structure.

Pioneer also relies on *Railroad Commission v. Entex, Inc.*, in which the supreme court stated, while addressing the Railroad Commission of Texas's rate-making, "The Public Utility Commission has adopted substantive rules which weight the type of debt based on a utility's actual capital structure." 599 S.W.2d at 295. We decline to hold that such an observation in dicta requires the Commission to use an electric utility's "actual capital structure," particularly given the absence of any statute or regulation expressly requiring the Commission to use the utility's actual capital structure in setting rates. We note that elsewhere in *Entex* the supreme court recognized that when an entity's rate base is inflated due to inflation or deflated due to recession, the administrative agency has the discretion to manipulate the rate of return in order to counteract those circumstances. *See id.* at 294.

Indeed, this Court has affirmed the Commission's use of figures other than those actually computed from a utility's current balance sheet to determine the cost of capital. In *Public Utility Commission v. GTE-SW*, although the record contained the actual costs of debt and equity, the Commission had applied a weighted cost so as to estimate a rate that would be sufficient for the utility to attract new capital. *See GTE-SW*, 833 S.W.2d at 157. The hypothetical cost of capital was employed because the actual cost of capital would not obtain the "reasonable return" required by statute. *See id.* at 158. This Court held that such a method was neither required nor prohibited by statute or regulation, and that the Commission did not abuse its discretion. *See id.* We again conclude that the Commission is not prohibited by statute or regulation from employing a

14

hypothetical capital structure when the use of such a hypothetical structure is supported by substantial evidence.

Pioneer next argues that the Commission's selected capital structure of 75% debt and 25% equity is not supported by substantial evidence. Pioneer contends that the Commission cannot apply a capital structure that no single witness or party explicitly proposed. Again, however, even when no evidence suggests a specific figure explicitly, the Commission may infer the figure if it is supported by some evidence in the record. *See id.* at 159. There was evidence that the actual 83/17 capital structure would be damaging to Cap Rock without increasing the percentage of equity, and that the proposed 60/40 capital structure would be damaging to ratepayers without decreasing the percentage of equity. Therefore, the evidence established a range within which an appropriate capital structure could be selected. Contrary to Pioneer's contention, we do not require that the record contain an explicit recognition by a particular witness or exhibit that a range of reasonable options exists in order for such a range to exist. While the parties may have argued for specific endpoints, the evidence presented in favor of and against each endpoint was such as would allow for a hypothetical capital structure to be selected between those endpoints. *See City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185-86 (Tex. 1994) (for admittedly complex matter, where one expert testifies to zero percent, and another to 50%, Commission could "select an amount within the range of figures"); *GTE-SW*, 833 S.W.2d at 158 (not abuse of discretion for Commission to make finding of 11.99% when expert witnesses separately testified to percentages of 10.54, 10.85, 12.1,

and 15). We conclude that the Commission's selecting a 75/25 capital structure was supported by substantial evidence.[1]

Pioneer argues that, having found that the use of a 60/40 capital structure artificially skewed in favor of equity allowed Cap Rock to earn an inflated return, the Commission was thereby barred from using a 75/25 structure that would produce the same effect. Pioneer also argues that the 75/25 structure unreasonably rewarded Cap Rock for its mismanagement. In fact, the Commission in its Order recognized it typically refuses to increase a utility's rates to protect the utility's financial integrity when such adjustment could reward inefficiency and imprudence, and the Commission noted that Cap Rock's ratepayers should not be required to reward Cap Rock for its pursuit of its "unreasonable expansion dreams."

However, in setting rates that are not excessive, the Commission is entitled to take into consideration the financial integrity of the utility. *See Entex*, 599 S.W.2d at 296; 16 Tex. Admin. Code § 25.231(c)(1)(A). There was evidence that while a 60/40 structure resulted in an inflated return, the actual 83/17 structure would not assure Cap Rock's financial integrity and access to capital. There was, therefore, evidence by which the Commission could conclude that the appropriate course was to balance the competing considerations and select percentages between the two proffered endpoints. In this regard, we note that the selected 75/25 structure is closer to the

---

[1] Pioneer asserts that there was no evidence that established that "a 75/25 structure was more correct than a 77/23 structure, a 79/21 structure, or an 81/19 structure." However, our inquiry is not whether the evidence establishes that the capital structure selected was the best option available. To the contrary, the record evidence may preponderate *against* the agency's decision and yet still provide a reasonable basis for the decision and, therefore, satisfy the substantial evidence standard. *See Cities of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 695 (Tex. App.—Austin 2005, pet. denied).

actual structure than to Cap Rock's requested structure. Moreover, along with setting a 75/25 structure between the endpoints, the Commission expressly required Cap Rock to use the entire amount of additional return afforded by the hypothetical 75/25 structure to retire debt. The Commission stated that without such requirement, it would not have approved a hypothetical structure in this case. Given, then, that the increased rates resulting from using a hypothetical structure between Cap Rock's actual structure and its desired structure are not to be paid to Cap Rock's management team, but must be applied toward making Cap Rock more financially sound, we find the Commission's determination that the 75/25 capital structure would not allow Cap Rock to earn an inflated return or reward Cap Rock's mismanagement to be supported by substantial evidence.

We conclude that the Commission did not err by approving a hypothetical capital structure consisting of 75% debt and 25% equity for Cap Rock. The Commission's selection of a 75/25 capital structure was based on substantial evidence, was not arbitrary and capricious, and was not an abuse of discretion.

*Rate of Return on Equity*

Pioneer asserts that the Commission erred by approving an 11.75% rate of return on equity. The use of a rate of return on equity greater than the 9.5% rate recommended by Pioneer[2]

---

[2] Pioneer's recommendation consisted of a 10% rate of return reduced by one-half percent to penalize Cap Rock for its imprudent management. Pioneer argues on appeal that its proposed rate of return was supported by the evidence and should have been approved by the Commission. However, our inquiry is not whether any rejected rate of return could have been reasonably selected, but whether the approved rate of return was reasonably selected. *See* Tex. Gov't Code Ann. § 2001.174 (West 2008); *Cities of Corpus Christi*, 188 S.W.3d at 695 (test is whether reasonable basis for agency's action exists in record, not whether correct conclusion reached).

17

resulted in a higher overall rate of return and, consequently, higher rates assessed to Cap Rock's ratepayers.

The Commission in its Order determined that the return on equity should include "a risk adjustment, because of Cap Rock's more tenuous financial situation, to approximate what comparable equity investments would earn." A Staff witness had recommended a "credit-risk premium," alleging that it was necessary to reflect the higher return that investors would require to make an investment in Cap Rock. According to the witness, his methods for calculating Cap Rock's return on equity were well-established methods on which the Commission has often relied, and his use of a premium was also well-established and had been previously relied on by the Commission, although less frequently. After describing in detail his analysis, the witness recommended a premium in the range of 2.0% to 2.4%, and ultimately a return on equity of 11.75%.[3] Elsewhere in his testimony, the Staff witness described some of the mismanagement that contributed to Cap Rock's financial condition and, as a result, greater difficulty in attracting investors. The Commission recognized in its findings of fact that Cap Rock's quality of management had been "poor," listing as evidence significant financial losses due to failed business ventures and aggressively pursued acquisitions with little relationship to Cap Rock's core business, and large bonuses paid to Cap Rock's executives during years in which its financial condition was deteriorating.

---

[3] Cap Rock also recommended a return on equity of 11.75%, to enable it to "attract capital on reasonable terms."

18

Pioneer contends that because the need for a risk adjustment in calculating the appropriate return on equity was a result of Cap Rock's mismanagement, the Commission was prohibited from approving the risk adjustment. Pioneer contends that, in Cap Rock's case, a risk adjustment would be nothing more than a reward for Cap Rock's past mismanagement.

Pioneer relies on the following language from the supreme court's opinion in *Entex*:

> The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, *under efficient and economical management*, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

*Entex*, 599 S.W.2d at 295-96 (quoting *Bluefield Waterworks & Improvement Co. v. Public Serv. Comm'n*, 262 U.S. 679, 693 (1923)) (emphasis added). Pioneer contends that this language prohibits the Commission from increasing the return on equity when such an increase ultimately results from the utility's inefficient or uneconomical management, because such a return would be unreasonable. We disagree. The above language refers to management subsequent to the rate-setting procedure, during the period in which the rates apply. It provides no guidance for a situation in which inefficient or uneconomical management occurred in the past.

Pioneer also relies on utilities code section 36.052, which provides as follows:

> In establishing a reasonable return on invested capital, the regulatory authority shall consider applicable factors, including:
>
> (1) the efforts and achievements of the utility in conserving resources;
>
> (2) the quality of the utility's services;

19

(3)  the efficiency of the utility's operations; and

(4)  the quality of the utility's management.

Tex. Util. Code Ann. § 36.052.  Pioneer contends that the Commission's failure to reduce the rate of return on equity demonstrates that the Commission failed to consider the factors required by section 36.052.  However, this Court has already considered the Commission's responsibility when faced with managerial imprudence, and held as follows:

> While the statute instructs the Commission to consider the quality of the utility's management, it does not require that the Commission lower the return on common equity if it finds *any* imprudence.  We understand the statute to leave to the Commission's discretion the decision whether the utility's management warrants a reduction in the overall rate of return.

*Texas Utils. Elec. Co. v. Public Util. Comm'n*, 881 S.W.2d 387, 417 (Tex. App.—Austin 1994), *aff'd in part, rev'd in part*, 935 S.W.2d 109 (Tex. 1997).

The Commission had discretion regarding how to adjust the rates in response to Cap Rock's mismanagement, and whether such adjustment would impact the rate-of-return-on-equity component of the rate-setting.  *See id.*  In fact, the Commission did adjust Cap Rock's rates in response to the evidence of mismanagement in the record.  As previously discussed, the Commission rejected Cap Rock's proposed capital structure of 60/40 so as not to reward Cap Rock for its mismanagement.  In addition, the Commission rejected Cap Rock's attempt to include various expenses in its rates based on their unreasonableness, limited the amount of reimbursable costs for Cap Rock's executive officers, and provided that an independent "management audit" be undertaken by Cap Rock.  As for the credit risk premium applied to the rate of return on equity, according to

20

the record its purpose was to ensure that the final rate of return was comparable to rates of return for companies with below-investment-grade ratings similar to Cap Rock's and, in turn, to increase Cap Rock's ability to attract investors. *See Entex*, 599 S.W.2d at 296 ("return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks" (quoting *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944))).

We conclude that the Commission did not err by approving a rate of return on equity of 11.75%. The Commission did not act unreasonably by approving a rate of return on equity that included a credit risk premium and that excluded any penalty for past mismanagement.

### Rate Case Expenses

The Commission allowed Cap Rock to recover approximately $2.5 million in rate case expenses incurred in preparing and presenting its rate case. Pioneer asserts that the Commission erred by approving those rate case expenses incurred for the work of two of Cap Rock's rate consultants—Larry Crowley and Dr. Stephen Gaske.

The utilities code provides that the Commission include in a utility's rates its reasonable and necessary operating expenses, which may include reasonable costs of the utility's participating in the rate-making proceeding. *See* Tex. Util. Code Ann. §§ 36.051, .061(b)(2) (West 2007). If, then, the Commission determines that a utility failed to prove the reasonableness of certain expenses incurred during the rate-making proceeding, the Commission may deny reimbursement of those rate case expenses. *See, e.g.*, *City of Port Neches v. Railroad Comm'n*, 212 S.W.3d 565, 581 & n.15 (Tex. App.—Austin 2006, no pet.); *City of Amarillo v. Railroad Comm'n*, 894 S.W.2d 491, 496-97 (Tex. App.—Austin 1995, writ denied). According to Pioneer,

21

the errors made by Crowley and Gaske were so unacceptably poor and prevalent that it was arbitrary and capricious and an abuse of discretion for the Commission to have charged the ratepayers for those consultants' expenses.

The Commission approved inclusion of $215,857 in fees and expenses related to Cap Rock witness Crowley's work, along with subsequent costs incurred by other witnesses to correct his work. Crowley was Cap Rock's initial revenue-requirements witness, and he prepared a significant portion of the rate-filing package. After withdrawing as a witness for family reasons, Crowley was replaced by two other witnesses who made numerous corrections to Crowley's work. As a result of those corrections, Cap Rock's request for a rate increase was reduced approximately from $10 million to $5 million. According to Pioneer, a significant portion of the replacement witnesses' work and testimony was dedicated to revising and correcting Crowley's work and explaining the reasons for such corrections.

While Pioneer is correct that the two witnesses who replaced Crowley made several corrections to his work, one of those witnesses, Gerald Tucker, testified to the value of Crowley's work. According to Tucker, although he had to make some "number changes" within the model created by Crowley, such "cost service model" was a "big part" of Crowley's work, was made by Crowley "from scratch," was not modified by Tucker or the other replacement witness, and worked very well as to Cap Rock's rate-filing package. Moreover, according to Tucker, his changes made to the numbers within the model were "not a major redo" and did not result in Crowley's earlier time spent on the model being a waste. Tucker testified that Crowley's work allowed him to prepare his rebuttal testimony more quickly, and stated that he was "impressed" Crowley had been able to

22

perform his work within the time frame he had been given. The Commission has broad discretion to determine recovery of expenses in a rate-making proceeding. *See City of El Paso v. Public Util. Comm'n*, 916 S.W.2d 515, 522 (Tex. App.—Austin 1995), *appeal dism'd by agr.*, 1996 Tex. App. LEXIS 1010 (Tex. App.—Austin Mar. 13, 1996). As to evidence presented about the reasonableness and necessity of rate case expenses, the agency is the sole judge of the weight of the evidence and the credibility of the witnesses. *See City of Port Neches*, 212 S.W.3d at 579-80. Tucker's testimony regarding the value of Crowley's work was sufficient to support the Commission's determination that the expenses incurred during the rate-making proceeding in connection with Crowley's work were reasonable.

The Commission also approved inclusion of $689,374 in rate case expenses associated with the work of Cap Rock's rate-design consultant Gaske. The SOAH administrative law judges had concluded in their proposal for decision that Gaske's work was "so flawed and unreliable as to be useless for structuring rates in this case." According to the administrative law judges, Gaske's initial presentation required numerous, significant changes, such that the intervenors had to spend significant, additional resources to address the revisions. In its final order, the Commission also rejected the rate design offered by Cap Rock based on Gaske's work. However, while acknowledging that there were "major problems" with Cap Rock's rate design, the Commission in its final order recognized the "many difficulties" arising from Cap Rock's producing the rate design in its first rate case "essentially from scratch," and reversed the administrative law judges' recommendation to disallow Gaske's rate-design expenses.

23

The Commission has broad discretion to determine recovery of expenses in a rate-making proceeding, *see City of El Paso*, 916 S.W.2d at 522, and may reverse the recommendation of administrative law judges on an issue, *see* Tex. Gov't Code Ann. § 2003.049(g) (West 2008). The Commission was entitled to take into consideration the facts that Cap Rock's rates had not been regulated by the Commission for a substantial period of time and, therefore, that Cap Rock had to create much of its rate-filing package from scratch. *See City of El Paso*, 916 S.W.2d at 522 (acknowledging that nature and complexity of case may be factor to be considered as to reasonableness of expenses). Therefore, even though Gaske's recommendation was not adopted, it was within the Commission's discretion to determine that his work was not useless and that Cap Rock did not act unreasonably in incurring expenses in connection with his work.

We conclude that the Commission did not err by approving those rate case expenses incurred by Cap Rock in connection with the work performed by its rate consultants Crowley and Gaske as "reasonable costs of participating in a [rate-making] proceeding." *See* Tex. Util. Code Ann. § 36.061(b)(2).

### Cap Rock's Point on Appeal

We turn to Cap Rock's appeal. The Commission imposed a discount of $2.44 per kilowatt for commercial customers who receive service at primary voltage. In its sole point on appeal, Cap Rock argues that the imposition of a discount was error.

The Commission allocated $1,711,714 of Cap Rock's total annual revenue requirement to the demand component of Cap Rock's commercial-customer class. Also, the Commission determined that 366,661 kilowatts was the amount of annual billed demand attributable

24

to the commercial class. The Commission then assigned to each commercial class a demand charge rate of $4.67 per kilowatt (which equals $1,711,714 divided by 366,661). Cap Rock does not dispute these figures. However, the Commission also found it reasonable for "commercial service customers who receive service at primary voltage" to receive a discount of $2.44 per kilowatt. Cap Rock contends that this discount violates section 36.051 of the utilities code, which provides that a utility's overall revenues be set at "an amount that will permit the utility a reasonable opportunity to earn a reasonable return." *See id.* § 36.051. According to Cap Rock, in order to earn a reasonable return, it must receive on average the full $4.67 per kilowatt from each commercial customer. Thus, Cap Rock argues, either the discount must be eliminated, or the losses resulting from the discount must be offset by increased rates charged to the commercial-customer class.

The discount of $2.44 per kilowatt adopted by the Commission in its final order for commercial service customers receiving service at primary voltage was recommended by Pioneer. During the administrative proceeding, Pioneer proposed an adjustment to Cap Rock's rate schedules to account for the lower costs associated with serving customers in the commercial class who owned their own transformers and, therefore, received power at the higher transmission-grade voltage. According to Pioneer, typically when a rate is applicable to customers receiving service at different voltage levels, the rate is discounted for service at higher voltage levels because fewer utility-owned facilities are needed to provide the service. Cap Rock points to nothing in the record to contradict Pioneer's proposal. Imposition of a $2.44-per-kilowatt discount, therefore, was supported by substantial evidence.

25

Cap Rock is correct that utilities code section 36.051 requires that the utility be given a "reasonable opportunity to earn a reasonable return." *See id.* However, we do not agree that the imposition of the $2.44-per-kilowatt discount eliminates Cap Rock's reasonable opportunity to earn a reasonable return.

> [T]he determination of just and reasonable utility rates is far from a precise process; instead, ratemaking relies substantially upon informed judgment and expertise and utilizes projections and estimates in virtually all areas. The ratemaking process is not capable of being neatly characterized as "actual" or "hypothetical."

*Public Util. Comm'n v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 411 (Tex. 1995). The Commission exercised its informed judgment and expertise in determining that a $2.44-per-kilowatt discount for a certain subclass of customers would not interfere with Cap Rock's receiving a reasonable opportunity to earn a reasonable return. Cap Rock has not shown that in order to receive such a reasonable opportunity, the entire $1,711,714 assigned to the demand component of Cap Rock's commercial-customer class had to be received in rates. Section 36.051 addresses a utility's overall return, not its return from a particular class of customers. *See* Tex. Util. Code Ann. § 36.051. As previously discussed, in determining the appropriate rate of return, the Commission approved a capital structure based on 75% debt and 25% equity, which involved an artificial increase in the equity percentage, and an 11.75% rate of return on equity, which incorporated a risk adjustment. Each of these selected percentages resulted in a higher overall rate of return and, consequently, higher rates assessed to Cap Rock's ratepayers. Cap Rock fails to demonstrate that any potential loss from the $2.44 discount would exceed the potential gains from such "hypothetical" increases to the rate of return or from other portions of the Commission's order not addressed in this opinion.

26

In *Suburban Utility Corp. v. Public Utility Commission*, the Texas Supreme Court found, on review of the record in a rate-making proceeding, that the Commission had calculated certain expenses at $200 less than the total amount to which the utility was entitled. 652 S.W.2d 358, 364 (Tex. 1983). Nonetheless, the court held that the utility failed to show substantial prejudice from the shortfall, and therefore, the court did not consider the error reversible. *Id.*; *see* Tex. Gov't Code Ann. § 2001.174(2) (administrative decision reversible if substantial rights prejudiced). In the same way, even if we were to determine that the $2.44 discount could result in a shortfall, Cap Rock has failed to show any prejudice from the discount. We do not read utilities code section 36.051 to mean that the mere fact—by itself—that the individual rates assigned to customer classifications result in a total that is less than—by some amount—the utility's revenue requirement established by the Commission in its discretion during the rate-making proceeding inevitably results in rates that fail to provide the utility a "reasonable opportunity to earn a reasonable return."

The Commission, taking the $2.44 discount into account, determined that Cap Rock had a reasonable opportunity to earn a reasonable return. We conclude that the Commission's determination is supported by substantial evidence and did not violate section 36.051 of the utilities code.

27

*Conclusion*

Having overruled the points on appeal asserted by Pioneer and by Cap Rock, we affirm the judgment of the district court.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   December 31, 2009